# Exhibit 1

ELECTRONICALLY FILED
2019 May 21 3:10 PM
CLERK OF COURT

## IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE
### FOR THE THIRTIETH JUDICIAL CIRCUIT AT MEMPHIS

| | |
|---|---|
| **ACUMENT GLOBAL TECHNOLOGIES, INC.** | **DOCKET NO.** __CT-2275-19__ |
| Plaintiff, | DIVISION: |
| v. | |
| **MALLINCKRODT ARD, INC.,** *Formally known as* **QUESTCOR PHARMACEUTICALS, INC.;** | **JURY TRIAL DEMANDED** |
| **MALLINCKRODT PLC;** | |
| **EXPRESS SCRIPTS HOLDING COMPANY;** | |
| **EXPRESS SCRIPTS, INC.;** | |
| **CURASCRIPT, INC.,** *doing business as* **CURASCRIPT, SD;** | |
| **PRIORITY HEALTHCARE CORP. AND PRIORITY HEALTHCARE DISTRIBUTION, INC.,** *doing business as* **CURASCRIPT SD AND CURASCRIPT SPECIALTY DISTRIBUTION SD,** *respectively*; | |
| **ACCREDO HEALTH GROUP, INC.;** | |
| **UNITED BIOSOURCE CORPORATION;** | |
| *and* | |
| **JAMES A. TUMLIN. M.D.** | |
| Defendants. | |

## COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF THE CASE ...................................................................................1

JURISDICTION AND VENUE ..........................................................................5

PLAINTIFF .........................................................................................................6

DEFENDANTS ...................................................................................................7

FACTUAL BACKGROUND .............................................................................10

History of Acthar Development, Distribution and Pricing ...............................11

    Acthar Development .......................................................................................11

    Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar
    Distribution to Maintain and Enhance its Monopoly Power over Acthar ...............12

    Acthar Distribution: the Acthar Support & Access Program and Express Scripts' "HUB" ...16

    Express Scripts Lowers the Cost of Daraprim .....................................................25

    Acthar Pricing Manipulation .............................................................................26

    The Views of Express Scripts' Chief Medical Officer, ......................................33

    Dr. Steve Miller, on Express Scripts' Market Power ..........................................33

THE MALLINCKRODT SYNACTHEN ACQUISITION AND EXPRESS SCRIPTS'
ROLE IN THE MAINTENANCE OF MONOPOLY PRICING FOR ACTHAR ......................43

THE QUI TAM WHISTLEBLOWER COMPLAINT AGAINST MALLINCKRODT .............46

RELEVANT MARKETS, MONOPOLY POWER,
AND THE FTC COMPLAINT AGAINST MALLINCKRODT ...................................49

    Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only
    Competitor Drug, Synacthen ..............................................................................53

    Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly .........54

    The Value of the Synacthen Assets .....................................................................55

    Mallinckrodt Disrupted the Synacthen Bidding Process ......................................55
    The Lawsuit Between Retrophin and Mallinckrodt for Mallinckrodt's Antitrust Violations ..56

i

Mallinckrodt's Acquisition of Synacthen Harmed Competition ..............................................57

Mallinckrodt Settles with the FTC.....................................................................................................58

Dr. Tumlin's Role in the Acthar Scheme as a Leading "KOL" for Mallinckrodt in the
Development and Promotion of Acthar for the Treatment of Nephrology Syndrome ...........60

Mallinckrodt targets nephrology syndrome as a "potential new market"
to promote off-label sales of Acthar. ......................................................................................61

Mallinckrodt engages KOLs for "white coat marketing" of Acthar to nephrology ...............61

Dr. Tumlin is hired as a Mallinckrodt KOL ......................................................................................62

Acument's Payments for Acthar in Tennessee for Long-Term the Treatment of iMN,
and Antitrust Injury.................................................................................................................66

COUNT I
ACUMENT v. ALL DEFENDANTS
MONOPOLIZATION OF THE ACTH MARKET IN VIOLATION OF THE TTPA................67

COUNT II
ACUMENT v. ALL DEFENDANTS
ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
RESTRAINT OF TRADE IN VIOLATION OF THE TTPA ........................................................74

COUNT III
ACUMENT v. ALL DEFENDANTS
VIOLATIONS OF THE TENNESSEE CONSUMER FRAUD LAWS.......................................77

COUNT IV
ACUMENT v. ALL DEFENDANTS
UNJUST ENRICHMENT ...............................................................................................................81

COUNT V
ACUMENT v. ALL DEFENDANTS
FRAUD ..............................................................................................................................................83

COUNT VI
ACUMENT v. ALL DEFENDANTS
CONSPIRACY TO DEFRAUD/CONCERTED ACTION.............................................................85

PRAYER FOR RELIEF ...................................................................................................................87

JURY DEMAND ..............................................................................................................................88

## COMPLAINT

Acument Global Technologies, Inc. ("Acument" or "Plaintiff") alleges as follows:

## NATURE OF THE CASE

1.      Acument brings this action to challenge the anti-competitive, unfair and deceptive scheme and conspiracy by Defendants, Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("Questcor") and its parent company, Mallinckrodt plc (collectively "Mallinckrodt"), as well as Mallinckrodt's exclusive agent for the delivery of its principal product, Express Scripts Holding Company ("ESHC") and Express Scripts, Inc. ("ESI")(collectively "Express Scripts"), including their wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript SD, formerly known as CuraScript Pharmacy, Inc., ("CuraScript"), Priority Healthcare Corp. and Priority Healthcare Distribution Inc. ("Priority") also doing business as CuraScript SD (collectively, "CuraScript SD"), Accredo Health Group, Inc. ("Accredo"), and United BioSource Corporation n/k/a United BioSource LLC ("UBC")(collectively referred to as the "Express Scripts Entities") and one of Mallinckrodt's principal medical provider advocates, James A. Tumlin, M.D. ("Dr. Tumlin").

2.      The anticompetitive scheme alleged herein sought to maintain and enhance Mallinckrodt's monopoly power in the U.S. market for adrenocorticotropic hormone (ACTH) drugs, and to fix the prices of ACTH drugs, in violation of the Tennessee antitrust laws.  The Defendants named herein conspired and agreed with one another to defraud patients and payors, like Acument, by overcharging them for Acthar when there existed other equally or more efficacious, and cheaper, treatments for the disease states for which Acthar was marketed, prescribed and sold.

3.     Mallinckrodt manufactures, markets, distributes and sells H.P. Acthar, NDC Nos. 63004-8710-01 and 63004-7731-01 ("Acthar").  Acthar is the only therapeutic ACTH product sold in the United States.  Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs.  Thus, Mallinckrodt is a monopolist.

4.     Mallinckrodt acquired its ACTH monopoly in 2001 when Questcor purchased Acthar from Aventis for $100,000.  By 2014, when Mallinckrodt purchased Questcor, the value of that Acthar monopoly was $5.9 billion—the price paid for the single-product company.

5.     This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly.  It seeks to challenge the lawfulness of Mallinckrodt's exercise of its monopoly power, in conjunction with its co-conspirators, by taking actions to maintain and enhance that monopoly power, and to fix prices, in violation of the Tennessee antitrust laws.

6.     The Tennessee antitrust laws permit indirect purchasers like Acument to recover for such unlawful conduct.

7.     The issue is not whether Mallinckrodt possessed monopoly power in the ACTH market.  It is whether Mallinckrodt's actions in 2007 to contract with the agent of its leading customers, Express Scripts, in order to limit distribution, and to raise and fix the prices of Acthar above competitive levels, was unlawful.

8.     Years later, in 2013, armed with this enhanced monopoly power through its direct agreements with Express Scripts, Mallinckrodt then further enhanced its monopoly power by acquiring the only competitive product in the marketplace, Synacthen.  Express Scripts did not push back on behalf of its clients, the third party payors who, like Acument, pay vast sums for specialty medications for their employees and their families.  Express Scripts brought no pressure against Mallinckrodt to either bring Synacthen to market or to lower Acthar prices.

Instead, Express Scripts continued to work with Mallinckrodt to preserve and protect the Acthar monopoly and price fixing scheme.

9.       Acthar is a "specialty pharmaceutical".  It is not sold in retail pharmacies, nor is it distributed through wholesalers to retail pharmacies, as with most prescription drugs.  Instead, it is distributed only through "specialty pharmacy distributors".

10.      While there are dozens of specialty pharmacy distributors in America, one of the largest is Express Scripts' CuraScript, including CuraScript SD, which Express Scripts has owned since 2004.

11.      In 2007, Mallinckrodt decided to embark on a self-described "new strategy", and it changed its distribution of Acthar as part of such strategy.  Express Scripts was critical to the success of this new strategy.  Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt chose to limit Acthar distribution exclusively through Express Scripts' CuraScript SD.  In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly and resulting price fixing agreement.

12.      As described more fully below, this "new strategy" involved the implementation of actual, written agreements, signed by both Mallinckrodt and Express Scripts, by which Express Scripts was granted exclusive specialty distribution of Acthar in exchange for its agreement to allow Mallinckrodt to raise the prices of Acthar to exorbitant, non-competitive levels.

13.      Immediately after signing the exclusive agreements in the summer of 2007, Mallinckrodt and Express Scripts jointly agreed in writing to raise and fix the average wholesale prices ("AWPs") paid for Acthar by employers like Acument from $2,062.79 per vial to

$29,086.25, more than a 1,300% increase in the cost of Acthar in the span of a month.

14.     As a result, this exclusive arrangement, Mallinckrodt was able to charge inflated prices for Acthar to all direct purchasers of Acthar, through Express Scripts acting as the "pharmacy benefits manager" or "PBM" of such direct purchasers, as well as all indirect purchasers of Acthar, like Acument, who purchase Acthar through a different PBMs.

15.     While Acument initially utilized Express Scripts as its PBM when its beneficiary was started on Acthar in 2011, it switched to CVS/Caremark in 2015-2016, when it began being charged by Defendants for the Acthar.

16.     In December 2015 Acument started paying for Acthar.  Acument was charged a price based upon the AWP for Acthar.  By that time, Mallinckrodt and Express Scripts had jointly agreed to raise the AWP for Acthar to over $40,000.00.  In other words, these Defendants jointly agreed to raise the price paid by patients and payors, like Acument, from $40.00 in 2001 to over $40,000.00 in 2015.  Working with their provider partner, Dr. James Tumlin, the Defendants collectively were able to charge patients and payors in Tennessee this inflated AWP, and were able to reap monopoly profits from their scheme.

17.     In the case of Acument, over the 13-month period between December 2015 and December 2016, Acument and its beneficiary spent $894,617.75 for just 13 prescriptions of Acthar given to the spouse of one of Acument's employees.  The employee's co-pay was $200.00 per prescription, meaning the employee paid $2,600.00 for the 13 doses.  Acument paid the full balance, $892,017.75.

18.     Acument brings this lawsuit to obtain declaratory and injunctive relief, in order to have the conduct of Defendants declared unlawful and to enjoin such unlawful conduct going forward to arrest the scheme and to prevent a recurrence of the overcharges.  Acument also seeks

4

to recover money damages for its past overcharge payments, including "the full consideration or sum paid" by it for Acthar, pursuant to Tennessee Trade Practices Act ("TTPA"), Tenn. Code. § 47-25-106.  Acument seeks recovery of its ascertainable loss of money expended in the payments for Acthar pursuant to Tennessee Consumer Protection Act ("TCPA"), Tenn. Code. § 47-18-109(a)(1).  Acument seeks compensatory damages pursuant to the Tennessee common law of unjust enrichment, fraud, conspiracy to defraud and aiding and abetting.  Finally, Acument seeks punitive damages for the Defendants' willful, outrageous and reckless conduct.

## JURISDICTION AND VENUE

19.    This Court has personal jurisdiction over the parties because most of the Defendants are located in and conduct substantial business in this State, are registered to do business in this State, have had systematic and continuous contacts with this State, and have agents and representatives that can be found in this State.

20.    Venue is proper in this Court because Defendants CuraScript SD, Accredo and UBS are all situated in this County, and the other Defendants transact business in this County. Venue is also proper pursuant to TTPA § 47-18-109(a)(2) because the alleged unfair or deceptive acts or practices took place, are taking place, and will continue to take place in this County unless abated by the declaratory and injunctive relief requested herein is granted.

21.    Acthar is sold in both interstate and intrastate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, the intrastate commerce of Tennessee.

22.    In fact, the Defendants' contacts both with and within this State have been to such degree that the anticompetitive conduct alleged herein has affected Tennessee trade and commerce to a substantial degree, as described more fully below.

## THE PARTIES

### PLAINTIFF

23.     Acument Global Technologies, Inc. ("Acument") is a Delaware corporation which employs individuals in 12 locations in the United States and Mexico, including in Spencer, Tennessee.  Specifically, Acument has a corporate office located 502 Industry Drive, Spencer, Tennessee 38585.

24.     Acument provides healthcare benefits to its employees through Blue Cross Blue Shield of Michigan ("BCBS Michigan").  In 2011, BCBS Michigan provided prescription drug benefits to Acument through its contracted PBM, Medco.  In July 2011, Medco was acquired by Express Scripts, along with Accredo and United BioSource.  As of that date – which was the same year that Acument had one of its beneficiaries placed on Acthar – Express Scripts was Acument's PBM.  In 2015 and 2016, Acument contracted with a different PBM, CVS/Caremark.

25.     The spouse of one of Acument's employees [hereinafter referred to as the "Patient" to protect the patient's HIPAA privacy rights] was treated by Defendant Dr. James A. Tumlin, of Chattanooga, Tennessee, during the time that Dr. Tumlin was serving as a paid consultant for Mallinckrodt.  Specifically, in 2011, Dr. Tumlin prescribed Acthar to the Patient, but Acument was not charged for it.  Then, between December 2015 and December 2016, Dr. Tumlin again prescribed Acthar to the Patient.  This time, Acument was charged and it paid $894,617.75 for Acthar at cost of $68,816.75 per prescription, while the Patient paid co-pays of $200 per prescription at a total cost of $2,600.  Acument paid the inflated price for Acthar as set by Mallinckrodt and Express Scripts and as charged by Dr. Tumlin.  As explained more fully herein, these exorbitant charges were based upon the inflated AWPs established by Mallinckrodt and Express Scripts, causing Acument to suffer antitrust injury.

**DEFENDANTS**

26.     Questcor Pharmaceuticals, Inc. ("Questcor") was acquired by Mallinckrodt on August 14, 2014 for $5.9 billion, after Questcor had paid only $100,000 for Questcor's lone product Acthar 13 years earlier.

27.     Following the acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and its name was changed to Mallinckrodt ARD Inc ("Mallinckrodt ARD"). Defendant Mallinckrodt ARD is a biopharmaceutical company incorporated in California, with offices located at 675 McDonnell Boulevard, Hazelwood, Missouri 63042, 26118 Research Road, Hayward, California 94545 and 1425 U.S. Route 206, Bedminster, New Jersey 07921.

28.     At the time of the Mallinckrodt acquisition of Questcor in 2014, Mallinckrodt ARD's only product sold in the United States was Acthar.  Since the acquisition, Mallinckrodt has continued to manufacture, distribute, market and sell Acthar directly to patients, exclusively through Express Scripts, by a program known as the "Acthar Support and Access Program" ("ASAP") described more fully below.

29.     Defendant Mallinckrodt plc ("Mallinckrodt plc") is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom.  Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

30.     Where appropriate, Mallinckrodt plc and Mallinckrodt ARD are collectively referred to as "Mallinckrodt".

31.     Defendants Express Scripts, Inc. ("ESI") and Express Scripts Holding Company ("ESHC") are Delaware corporations with their principle executive offices located at 1 Express Way, Saint Louis, Missouri 63121 and Century Center Drive, Memphis, Tennessee (collectively,

"Express Scripts").

32.     Defendants Priority Healthcare Corp. and Priority Healthcare Distribution Inc. ("Priority") d/b/a CuraScript SD (collectively, "CuraScript SD"), are wholly-owned subsidiaries of Express Scripts.  Priority/CuraScript SD has maintained corporate offices at 1680 Century Center Parkway, Memphis, Tennessee 38134-8827.

33.     Defendant CuraScript, Inc., d/b/a CuraScript SD, f/k/a CuraScript Pharmacy, Inc., is a wholly-owned subsidiary of Express Scripts.  ESHC acquired CuraScript in January 2004. Its operation was expanded when ESHC acquired Priority in October 2005 and combined it with CuraScript.  The combined Priority and CuraScript SD (collectively "CuraScript") became one of the nation's largest specialty pharmacy and distribution companies with more than $3 billion in annual revenue.

34.     CuraScript is an Indiana corporation with corporate offices located at 255 Technology Park, Lake Mary, Florida 32746.  This is the same Florida address patients are required to mail any revocation of the broad authorization granted by patients to Mallinckrodt and Express Scripts via the Acthar Start Form (*see*, Exhibit "A" hereto).  CuraScript has been Mallinckrodt's exclusive specialty pharmacy distributor for Acthar since 2007.

35.     Significantly, Express Scripts chose to end this exclusive distribution relationship in September 2017 only after it was sued for antitrust in 2017 by the City of Rockford, Illinois.

36.     Defendant Accredo Health Group, Inc. ("Accredo") is a wholly-owned subsidiary of Express Scripts.  Accredo became a wholly-owned indirect subsidiary of Medco Health Solutions, Inc. ("Medco") on August 18, 2005, months before Express Scripts acquired Priority, and then became part of Express Scripts when Express Scripts acquired Medco in 2012.  At that time, Medco became a wholly owned subsidiary of ESHC.

37.     Accredo is a Delaware corporation with its corporate headquarters at 1640 Century Center Parkway, Memphis, Tennessee 38134 and a business location at 201 Great Circle Road, Nashville, Tennessee 37228.  Accredo also has operations in Warrendale, Pennsylvania; Corona, California; Greensboro, North Carolina; Orlando, Florida; and Indianapolis, Indiana.

38.     Defendant United BioSource Corporation n/k/a United BioSource LLC ("UBC") is a Delaware corporation with its corporate headquarters at 920 Harvest Drive, Blue Bell, Pennsylvania 19422 and a business location at 1670 Century Center Drive, Memphis, Tennessee. UBC was a wholly-owned subsidiary of Express Scripts from 2012, when it was acquired by Express Scripts as part of the Medco merger, until November 2017, when Express Scripts announced that it sold UBC to Avista Capital Partners, a private equity firm.

39.     UBC is a wholly owned subsidiary of United BioSource Holdings, Inc., the interests of which are held by and through various privately held intermediary entities, which are ultimately owned by private investment funds sponsored by and/or affiliated with Avista Capital Partners and as-yet-unknown individuals associated with Avista Capital Partners.

40.     UBC is described as Mallinckrodt's "agent" on the Acthar Start Form (*see* Exhibit "A" hereto) which Mallinckrodt employs exclusively to operate the ASAP program and to manage the Express Scripts Entities' exclusive distribution, sales and reimbursement of Acthar by its 3 operating arms, CuraScript, Accredo and Express Scripts.

41.     UBC provides customer support and reimbursement support for Acthar as the "HUB" of Express Scripts' three operating arms, CuraScript (providing specialty distribution services), Accredo (providing specialty pharmacy services) and Express Scripts (providing pharmacy benefit management services).

42.     Defendant James A. Tumlin, M.D. ("Dr. Tumlin") is a physician who specializes

in nephrology and is associated with Nephrology Associates of Chattanooga located at 2300 E. 3rd Street, Chattanooga, Tennessee.

43.     Dr. Tumlin is founder and medical director of Southeast Renal Research Institute (SERRI) since 2005.  The institute was brought to Chattanooga in 2008 and merged with Nephrology Associates' Research Department.

44.      Dr. Tumlin is one of Defendant Mallinckrodt's principal medical providers and key opinion leaders ("KOLs").  He has been paid hundreds of thousands of dollars for his work on behalf of the company.

45.     Dr. Tumlin was the treating physician for one of Acument's employee's spouse.

46.     As stated in Paragraph 1 above, ESI, ESHC, CuraScript, Accredo and UBC are collectively referred to herein as "Express Scripts".

47.     Mallinckrodt and Express Scripts are collectively referred to herein as "Defendants", as appropriate.

48.     The Defendants' acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

## FACTUAL BACKGROUND

49.      "I have a Cadillac in my refrigerator."  That is how one Acthar patient named Sharon Keller described an unused 5-ml vial of the medication sitting in her kitchen refrigerator.

50.     The tale of how a 65 year-old brand medication could rise in price from $40 per vial in 2001, to $40,840.80 per vial by 2015, raising that value of the brand from $100,000 to $5.9 billion, is a story of perhaps the most egregious fraud and monopolistic conduct in U.S.

history by a prescription drug company.

51.    The issue in this case is how Mallinckrodt achieved such a startling outcome.

## History of Acthar Development, Distribution and Pricing

## Acthar Development

52.    Acthar was approved by the Food and Drug Administration ("FDA") in 1952 for over fifty conditions, ranging from alcoholism, poison ivy, and radiation sickness to nephrotic syndrome. Over time, with additional evidence-based requirements for prescription drugs, the list was winnowed to the fewer, present-day nineteen indications.

53.    Acthar is adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones. Two Mayo Clinic researchers, Drs. Philip Hench and Edward Kendall, developed the treatment, which won them the Nobel Prize for medicine at the time it was developed. Acthar was developed by Armour Pharmaceutical Company. As described by the Seventh Circuit in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 145-46 (7th Cir. 1960):

> In a human being, . . . (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by certain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.
>
> The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself, directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

54.     By the 1960s, injectable ACTH medications faced a variety of competing products. *See id.* at 145 ("Both Armour and Wilson manufacture and sell gelatin-ACTH preparations . . . . Gelatin-ACTH now constitutes more than 80% [o]f all forms of ACTH products sold by Armour and Wilson.  Other companies . . . produce similar products").

55.     For the majority of the drug's lifespan, however, generic corticosteroids, such as prednisone, effectively treated the majority of the indications for which Acthar was approved. That factor tended to limit the market for Acthar to treating infantile spasms ("IS") which was originally an "off-label" indication.  Consequently, because of the limited, off-label market for Acthar, by 2001, the drug was priced at $40 per vial and accounted for less than a million dollars of revenue for Aventis Pharmaceuticals, Inc. ("Aventis"), the then-owner.

56.     In 2001, Questcor acquired Acthar from Aventis for only $100,000, but in 2014 Mallinckrodt acquired Questcor for $5.9 billion.

57.     Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 children per year.  However, Acthar was not originally approved by the FDA to treat IS, further limiting its value.  In 2010, the IS indication was approved by the FDA, and orphan drug status was granted.

### Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar Distribution to Maintain and Enhance its Monopoly Power over Acthar

58.     Acthar is a specialty pharmaceutical distributed directly to patients, like the beneficiary Patient of Acument in this case.

59.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy who requested the drug to treat seriously ill patients.  After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

60.     However, on July 2, 2007, Mallinckrodt restricted its distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to just Express Scripts, the agent of its largest customers.  Mallinckrodt's announcement stated, **"[e]ffective August 1, 2001, Acthar…will be available exclusively through Specialty Pharmacy Distribution**.  Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies."  *See* July 2, 2007, "Urgent Product Alert H.P. Acthar Gel" (attached to the Complaint at Exhibit "B").  All distribution would now be done exclusively through CuraScript.  Mallinckrodt directed that "all new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program."  *Id.*  From that point on, all aspects of Acthar distribution were handled by the Express Scripts Entities.

61.     The goal of this "new strategy" was to lock patients into receiving Acthar through one distribution channel controlled by Mallinckrodt and the Express Scripts Entities, and to ensure prescription distribution and payment through one source, Express Scripts Entities.  Mallinckrodt has maintained this exclusive arrangement with the Express Scripts Entities since 2007 up through at least September 2017 when the Express Scripts Entities claim that CuraScript SD "is no longer the exclusive distributor of Acthar".

62.     Of course, Mallinckrodt and the Express Scripts Entities were sued for antitrust in April 2017 by the City of Rockford, and thus apparently only ended the "exclusive distribution" aspect of their unlawful arrangement in response to such claims.  However, other aspects of their unlawful arrangement remain, including their use and employment of the ASAP, which continues to be operated by their self-described "HUB", UBC, as described more fully below.  As a result, declaratory and injunctive relief continues to be required in this case to eradicate the harmful effects of Defendants' unlawful conduct moving forward.

63.     Mallinckrodt's "new strategy" was the brainchild of Greg LaPointe, a member of the Questcor Board of Directors and former Chief Executive Officer of Sigma-Tau Pharmaceuticals, the largest shareholder in Questcor in the early 2000s, and Steve Cartt, Questcor's Chief Operating Officer and Executive Vice-President in charge of sales and marketing of Acthar.  LaPointe also served as a member of the Corporate Council of the National Organization for Rare Diseases ("NORD"), which served as an important player in Mallinckrodt's scheme to minimize resistance and pushback by patients and physicians to Acthar's higher prices by serving as a leading distributor of free Acthar supplied by Mallinckrodt to patients who could not afford to pay the newly established monopoly prices.

64.     LaPointe and Cartt approached then-Questcor Board member Don Bailey to garner his support for the new strategy.  Their "offline" discussions did not sit well with Questcor's President and CEO at the time, James L. Fares.

65.     In February 2005, Mr. Fares was appointed President and CEO of Questcor by the Board of Directors.  According to Albert Hanson, the Chairman of the Board, "the Board sought an accomplished pharmaceutical executive with substantial expertise in selling and marketing pharmaceutical products."  Chairman Hanson further explained the selection of Feres as follows:

> [T]he Board assessed each candidate's track record and capability to think creatively about Questcor's business.  Such skills are critical in developing and executing a successful long-term strategy for a specialty pharmaceutical business.  We looked for a talented executive who understood the specialty pharmaceutical market and had demonstrated the leadership skills necessary to create shareholder value.  We believe that in Jim Fares we have found that executive.  His successful track record in sales, marketing, business development, and general management, coupled with his energy and enthusiasm for pharmaceuticals, convinced us that we had found the right individual to lead Questcor.

66.     Prior to joining Questcor, Feres held senior management positions at Merck,

Athena Neurosciences and Elan Pharma.  He founded and served as Sr. Vice President of Commercial Operations at Xcel Pharmaceuticals from 2001 – 2003.  In his last position, he served as CEO and President of FGC Pharm/Novella Neurosciences.

67.     Feres resigned in May 2007.  He was replaced by Don Bailey, whom the Board first appointed as Interim President, but then elevated to full-time President and CEO in conjunction with Questcor's adoption of the new strategy.

68.     Mallinckrodt signed contracts with the Express Scripts Entities in late June 2007.

69.     Shortly thereafter, in July 2007, three Board members resigned, including the Chairman Albert Hanson.

70.     Questcor's Sr. Vice President of Strategic Planning and Communications, Eric Liebler, also quit.  Liebler quit less than a year after being hired.  He quit just three weeks after the "new strategy" was announced.

71.     In spite of this mass exodus of leading executives and Board members, Mallinckrodt chose to adopt a controversial "new strategy" to allow Mallinckrodt to "optimize" its monopoly status for Acthar, especially in the IS market.

72.     The self-described "orphan drug strategy" worked as follows: despite the fact that Acthar was an older drug, Mallinckrodt would "re-launch" Acthar with a new, limited distribution system and a substantially higher price, to make it appear as if Acthar were a new product being launched as the only product indicated for IS, an off-label indication at the time.

73.     The IS market was a captive market involving a life-threatening disease afflicting infant children.  Like other debilitating or life-threatening, orphan conditions, for which there was only one, sole-source drug treatment, IS presented Mallinckrodt with an opportunity to leverage its monopoly power against a particularly fragile, powerless patient population in an

15

extremely narrow market.

74.     As a result, Mallinckrodt predicted that the IS market would likely be able to absorb a much higher price with little resistance.  In contrast, Mallinckrodt feared that the market for drug treatments of other disease states, such as the MS market, would not tolerate such a higher price.  Nevertheless, Mallinckrodt only viewed the anticipated resistance to higher prices by patients and payors as a challenge to be overcome.

75.     Mallinckrodt overcame such challenge in at least two ways after the launch of the new strategy in August 2007: (1) conspiring and agreeing with the Express Scripts Entities to eliminate competition, enhance Mallinckrodt's monopoly power, and to raise and fix the prices for Acthar; and (2) engaging leading medical providers, described as "key opinion leaders" or "KOLs", like Defendant Dr. Tumlin, in the treatment of the various disease states for which Acthar was narrowly indicated to ensure that Acthar was prescribe as a primary course of treatment.

76.     The new pricing established by Mallinckrodt and Express Scripts was only limited by what these companies predicted that payors, like Acument, would be willing to bear.

77.     Mallinckrodt Executive Vice-President, Steve Cartt, admitted "'[w]e did some market research,' . . . [t]alking to physicians and others about pricing 'gave us some comfort that the [new] strategy would work, and physicians would continue to use the drug, and payers would pay' . . . . 'The reality was better than we expected.'"[1]

**Acthar Distribution: the Acthar Support & Access Program and Express Scripts' "HUB"**

78.     One of the primary means by which Defendants manifested their unlawful scheme was through a program known as the "Acthar Support & Access Program" or "ASAP."  This

---

[1] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.)(hereinafter, "*Fruedenheim*").

program is structured so that Mallinckrodt ships Acthar directly to patients and receives payment directly from the associated third party payors.

79.     Once the patient (or their physician) contacts Mallinckrodt for a prescription of Acthar, they are directed to UBC.  Otherwise, patients and/or their providers contact UBC directly, as directed by the Acthar Start Form at attached as Exhibit "A" hereto.  UBC then serves as the "HUB" for Mallinckrodt and the Express Scripts Entities.  UBC also serves as the primary interface with other PBMs, like CVS/Caremark utilized by Acument in 2015-2016 when it paid for Acthar.  As the HUB, UBC confirms the prescription by the provider with a specialty pharmacy, whether Accredo or some other specialty pharmacy.  UBC then confirms the patient's insurance coverage or other source of payment, whether with Express Scripts, CVS/Caremark or some other PBM or insurer.  UBC then arranges for Acthar to be delivered directly to the patient by CuraScript.

80.     This process is laid out in the form provided by Mallinckrodt, the "Acthar Start Form" (Exhibit "A" hereto).  The form requires patient, physician/pharmacy and payor authorization before Mallinckrodt ships the Acthar to patients via CuraScript.  At no point is any Express Scripts Entity at risk, as Mallinckrodt ensures its payment at each level of the process.

81.     The Acthar Start Form consists of 3 sections: (1) a section requiring signature by the "HCP" (or health care professional); (2) a patient authorization requiring signature by the "patient or legal representative"; and (3) information concerning Acthar indications and usage. The required signature of the patient authorizes "Mallinckrodt **and its agents**" to do a number of things in relation to the prescription and distribution of Acthar.  It further authorizes Mallinckrodt and its agents, "including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support Access

17

Program on behalf of Mallinckrodt (collectively, 'Designated Parties')" to provide Acthar and receive payment, among other things.

82.     Specifically, the patient authorizes Mallinckrodt, UBC, "or any other operator" of ASAP on behalf of Mallinckrodt, referred to as Mallinckrodt's "Designated Parties", "to provide certain services to [the patient], including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injecting training."  In other words, the patient directly authorizes Mallinckrodt and its agents to ship Acthar to them directly via CuraScript, and authorizes payment by both the patient and any third party payor prior to obtaining the medication.  So, the patient authorizes Express Scripts to bill the payor for Acthar.

83.     Similarly, the physician must "authorize[ ] United BioSource Corporation ("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other designated operators of the program, to perform a preliminary assessment of benefit verification for this patient…".  The physician also "agree(s) that the designated specialty pharmacy receive this prescription via a designated third party, the Program and that no additional confirmation of receipt of prescription is required by the designated specialty pharmacy."

84.     The interaction of all 4 elements of the Express Scripts Entities' functions on behalf of Mallinckrodt are described below.

85.     Express Scripts is one of the largest PBMs in the United States.

86.     PBMs pool together the purchasing power of all their health plan clients to get greater volume discounts and rebates from drug manufacturers than a single plan could do on its own.

87.     Express Scripts negotiates with pharmaceutical manufacturers for both discounts

18

and rebates on prescription drugs.  Express Scripts then offers its health plan customers both discounts and rebates on such prescription drugs.

88.     In terms of the financial benefits to Express Scripts' health plan customers, drug discounts and rebates are the same.  Paying rebates to a plan for a prescription drug is functionally equivalent to charging the plan a reduced price for that drug (a rebate is simply a retroactive discount on the price of the drug).

89.     As a large purchaser of prescription drugs, aggregating the purchasing power of its many health plan clients, Express Scripts has a financial advantage in its negotiations with pharmaceutical manufacturers that arises from its market power.

90.     The "family" of Express Scripts Entities does more than simply process claims for prescriptions filled at pharmacies for their plan customers.  In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", the Express Scripts Entities offer "specialty services that deliver . . .  high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy management programs, [] data analysis, and [] distribution services."[2]  Acting "either directly or through its subsidiaries", including the Express Scripts Entities, Express Scripts acts as a direct pipeline from a pharmaceutical manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

91.     Express Scripts is able to act as a manufacturer's direct distributor of specialty drugs to patients because it provides what it calls "integrated specialty services."  (emphasis in original).[3]  As one Express Scripts' executive put it "we're family."  These integrated services

---

[2] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending December 31, 2012.

[3] https://curascriptsd.com/corporate-overview

include a PBM (Express Scripts), a specialty pharmacy distributor (CuraScript), and a specialty

pharmacy provider (Accredo).

92.     Express Scripts coordinates all of these functions through its so-called

pharmaceutical support services unit, UBC.  UBC acts as a "'hub,' that serves as a centralized

point of contact for [] patients [] and prescribers"[4] by "[w]orking hand-in-hand with Express

Scripts' specialty pharmacy and specialty distribution organizations, Accredo and CuraScript

[],"[5] to coordinate delivery of and reimbursement for specialty pharmaceuticals.

93.     In total, UBC operates "an integrated service model that involves UBC . . .

manag[ing] multiple system applications that support one product.  [UBC's] services include the

UBC coordinating center, nurse coordination . . . product fulfillment through Accredo and

wholesale fulfillment through CuraScript[].  When a patient is prescribed [a specialty]

medication, the doctor sends a referral to the Reimbursement Hub. [UBC's] team serves as the

liaison among doctors, patients, and insurance companies as [UBC] . . . navigate[s] the coverage

process.  [UBC] . . . ensure[s] a smooth transition from enrollment through shipment of the

medication."

94.     Part of the reimbursement hub process is coordination with Express Scripts'

CuraScript, which acts as an "integrated delivery network" connecting patients to manufacturers

through "end-to-end distribution services."[6]  Simply put, CuraScript is similar to a FedEx, DHL,

or UPS for specialty prescription drugs.  CuraScript advertises that it is "recognized by the

manufacturing community as [] a reliable partner in the management of brands" through

---

[4] http://www.ubc.com/services/loyalty/reimbursement-patient-assistance

[5] http://www.ubc.com/about/about-ubc

[6] https://curascriptsd.com/Rare-Disease-Specialty-Distribution-Program

CuraScript's "integrated specialty services," which deliver medications to patients "alongside sister organizations Accredo and UBC."[7]

95.     To facilitate these end-to-end distribution services, UBC coordinates CuraScript's activities with Accredo, which provides so-called specialty pharmacy services.  By acting as the hub, UBC ensures that a patient whose pharmacy benefits are managed by Express Scripts can get a specialty medication delivered to him or her by coordinating direct shipment through CuraScript and Accredo and direct payment through Express Scripts.  "As one UBC executive has explained "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

96.     Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions.  Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

97.     Along with UBC, Accredo provides: (a) support to orphan and ultra orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address patient concerns and provide guidance on mitigating adverse events; (d) reimbursement HUB specialists to steer patients to funding solutions, and (e) an integrated solution allowing patients to start therapy twice as fast.

98.     The Acument patient at issue dealt with CVS Caremark Specialty for their fulfillment of Acthar.  It is believed, and therefore averred, that UBC coordinated the shipment

---

[7] https://curascriptsd.com/supplier-relations

of Acthar directly to the Patient via the same integrated "hub" network with the lone exception being that Acument's payment was made to its PBM, CVS Caremark, before being routed to Mallinckrodt.  In all other respects, the operations of the hub were the same, with the Acthar being shipped by Express Scripts' CuraScript pursuant to the same 2007 exclusive agreement .

99.     In simple terms, through UBC's coordination with Accredo, CuraScript, and Express Scripts, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

100.     With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through what it has called the ASAP Program.  Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP program.  *See* Exhibit "B".  In this announcement, Mallinckrodt directed physicians that "all new Acthar [] prescriptions should be submitted to the [ASAP program]."  Prescriptions are submitted to the ASAP program through the "Acthar Start Form."  *See* Exhibit "A".  This form authorizes UBC to coordinate reimbursement with Express Scripts and direct the prescription to a "designated specialty pharmacy."  This designated specialty pharmacy is Accredo.  Accredo dealt with the Acument patients in 2015.  Part of UBC's activities involve coordinating the shipment of Acthar from CuraScript through Accredo to the patient.  Indeed, in order to revoke UBC's authorization to perform these services, the patient must mail a letter to CuraScript's address in Florida.  It is believed and therefore averred that Acument's patient provided a similar authorization to UBC for shipment from CuraScript.

101.     The Acthar direct distribution arrangement between Mallinckrodt and Express Scripts is illustrated in the following two figures.  In Figure 1, the product distribution

arrangement is as follows.



**Figure 1**

102.    Figure 2 below illustrates how Acthar is prescribed, authorized, distributed and paid for through Express Scripts. Although these payments pass through Express Scripts, payment flows and products flows are ultimately aligned between Mallinckrodt and UBC, Express Scripts' reimbursement hub, through a contract with Mallinckrodt to operate the ASAP program, which confirms the medical necessity of the prescription (by Accredo or other specialty pharmacy), arranges for payment (by PBMs like Express Scripts and CVS Caremark) and then for shipment and billing (by CuraScript).



**Figure 2**

103.     Since the launch of the new strategy, CuraScript has contracted directly with Mallinckrodt to ship Acthar.  Through such contractual arrangement, Acthar travels from Mallinckrodt directly to the patient, and payments are channeled directly back to Mallinckrodt.

104.     As depicted above, the patient typically has prescription insurance coverage through his or her health plan.  In this case, Acument had the health plan that covered its Patient. The health plan contracted with Medco/Express Scripts to supply prescription drugs, including specialty drugs like Acthar.  Express Scripts thus collects payments for the price of Acthar from the payer on behalf of Mallinckrodt.  Later, Acument's health plan contracted with CVS Caremark to provide prescription drug services for its covered employees and their families. CVS Caremark, like Express Scripts, thus collects payments for the price of Acthar from the payer on behalf of both Express Scripts and Mallinckrodt, and transfers a portion of those payments to the Defendants.

105.     By these arrangements, Acthar product flows directly from Mallinckrodt through Express Scripts to the patient, while the money flows directly from the patient and payor through Express Scripts back to Mallinckrodt for all payers who contract with Express Scripts for PBM services.  For payers who contract with other PBMs, like Acument in 2015 and 2016, the money flows indirectly through the other PBM and then on to the Defendants.  However, the product flow remains direct, as depicted in Figure 1 above.

106.     Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States.  This bargaining power has allowed Express Scripts to push back against attempts by pharmaceutical drug manufacturers to charges inflated prices for drugs above the actual market value of the drugs.

107.     Mallinckrodt leveraged and enhanced its monopoly power by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, Express Scripts, Accredo and UBC, along with CuraScript, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to direct reimbursement by the payor.  This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.

### Express Scripts Lowers the Cost of Daraprim

108.     Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim, and proceeded to increase the price 5000% from $13.50 to $750.00 per pill.  One year's course of treatment rose from $6,500 to $361,000.

109.     Strikingly, Express Scripts employed its market power to counter Turing's action. It worked to create an alternative that was much less expensive than Daraprim.

110.     On December 1, 2015, Express Scripts announced that it would "partner with Imprimis Pharmaceuticals to drive access to a low-cost alternative to Daraprim." "Express Scripts Champions $1 per Pill Access to an Alternative for Daraprim", Dec. 1 2015, http://lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim. In partnership with Express Scripts, "Imprimis [] offer[ed] a compounded oral formulation of pyrimethamine and leucovorin (a form of folic acid) for as low as $1 per capsule for people whose pharmacy benefit is managed by Express Scripts."  Id. When it is in Express Scripts' interest, it acts to "improve access and affordability."  Id.

111.     Express Scripts' Chief Medical Officer, Dr. Steve Miller, stated that Express Scripts had found a way to deliver "a safe, high-quality and extremely cost-effective way to provide access to a Daraprim alternative."  However, because of its agreement with

Mallinckrodt, Express Scripts has not served as an effective agent for pharmaceutical buyers to seek to lower the cost of Acthar, or the availability of reasonably priced alternatives.

**Acthar Pricing Manipulation**

112.    Mallinckrodt acquired the rights to Acthar from Aventis in July 2001.

113.    At the time of its acquisition, the end payor price of a vial of Acthar was approximately $40.00.

114.    After acquisition, Mallinckrodt raised the per vial substantially.  By September 2001, Mallinckrodt raised the list price for Acthar, or the wholesale acquisition cost ("WAC"), to $748.16.  It raised the end payor price, or the average wholesale price ("AWP"), to $935.20.

115.    From 2001 until Mallinckrodt executed its new strategy in 2007, the WAC grew from $748.16 to $1,650.23, while the AWP grew from $935.20 to $2,062.79.

116.    The below table reflects the WAC price changes implemented by Mallinckrodt from 2001 through February 2007:

| Sept. 21, 2001 | $748.16 |
| June 24, 2002 | $782.60 |
| April 1, 2003 | $859.20 |
| March 1, 2004 | $902.00 |
| January 1, 2005 | $988.00 |
| April 1, 2005 | $1,037.20 |
| January 1, 2006 | $1,120.40 |
| October, 1, 2006 | $1,232.44 |
| December 21, 2006 | $1,269.41 |
| February 2, 2007 | $1,650.23 |

117.    When Mallinckrodt implemented its new strategy on August 27, 2007, it raised the WAC for Acthar from $1,650.23 to $23,269.00.  It also raised the AWP for Acthar from $2,062.79 to a staggering $29,086.25 – representing a 1,310% increase in the span of a month, and a 72,615% increase from the time Mallinckrodt first acquired the drug.

118.    Express Scripts was keenly aware of this price increase, as it participated directly in the decision-making with Mallinckrodt.  However, when it reported the increase to its customers and the public as part of its annual "Drug Trend Report" for 2007, Express Scripts reported only that Acthar "experienced a significant price increase in 2007."[8]  It further stated that "[i]n August 2007, the manufacturer of this drug increased its wholesale price from $2,062 per vial to more than $29,000 per vial, increasing the average cost per prescription to $11,041."

119.    This statement by Express Scripts was false, misleading and deceptive.  It sought to lay the blame for the price increase on the manufacturer of Acthar, Questcor, without revealing the truth about its direct involvement in decision to raise prices in the wake of contracting for exclusive distribution rights.

120.    Until Mallinckrodt obtained FDA approval for the IS indication in 2010, the price of Acthar remained relatively stable.  However, in 2011, Mallinckrodt increased the price of Acthar three times: by 5% on January 3, 2011, by another 5% on June 1, 2011, and then by 6.5% on December 27, 2011.  These three price increases totaled a staggering 16.5% in one year.  As of 2012, Acthar's end payor price/AWP stood at $34,150.00.

121.    Each such price increase was reviewed with Express Scripts and approved by Express Scripts, in writing, as required by the parties' written agreements.

---

[8] Express Scripts 2007 Drug Trend Report at p. 35, available at http://lab.express-scripts.com/lab/publications ("2007 Drug Trend Report").

122.   Despite the fact that both Mallinckrodt and Express Scripts were keenly aware that Acthar pricing was a sensitive topic for payors, like Acument, they continued to the raise the Acthar prices each year.  They raised the price by 5% on May 15, 2012.

123.   Further, as discussed more fully below, Mallinckrodt, along with Express Scripts, continued to conceal and suppress the truth about their coordinated conduct in raising Acthar prices, and continued to misrepresent publicly the reasons for the many Acthar price increases.

124.   A poignant example is the attempted price increase in September of 2012.

125.   That month, Mallinckrodt desired to take another 5% price increase.  The decision to raise the Acthar price was made by Questcor's COO Steve Cartt in early September.  Mr. Cartt then communicated with Express Scripts executives via email on September 5 to seek their approval, as required by the parties' agreements.  Their intention was to make the price increase effective on September 25, 2012.

126.   There was no expectation by either Mallinckrodt or Express Scripts that the additional 2012 price increase – raising the total increase for the year to 10% – would materially impact Acthar ordering levels, due to the monopoly Mallinckrodt held over Acthar and the substantial assistance of the Express Scripts Entities in ensuring that Acthar was prescribed, and paid for, at the ever-increasing price levels.

127.   Furthermore, the parties jointly agreed to conceal their joint agreement, keeping their awareness of and involvement in the price increase on a "need to know" basis within their respective organizations.

128.   However, before the parties' could finalize their agreement to raise the Acthar price by an additional 5% for 2012, a problem arose.  On September 19, 2012, health insurer Aetna announced that it would cut back reimbursements for Acthar, due to the lack of evidence

of Acthar efficacy for various disease states among other reasons.

129.    Questcor's stock (as opposed to Mallinckrodt at the time) declined 56% the same day as the Aetna announcement.  Within a week, Questcor's stock fell another 37%.

130.    Mallinckrodt and Express Scripts then jointly agreed to place the intended price increase on hold, due to the Aetna situation.

131.    This price increase was later taken by Mallinckrodt and Express Scripts on June 7, 2013, when the Acthar WAC was increased 5% to $30,120.00 and the Acthar AWP was increased 5% to $37,650.

132.    In 2014, Mallinckrodt and Express Scripts resumed their aggressive price increase strategy, just prior to Mallinckrodt plc's $5.9 billion acquisition of Questcor.

133.    On January 16, 2014, the Acthar WAC and AWP were raised 5%, to $31,626 and $39,532.50, respectively.

134.    Prior to Questcor's acquisition by Mallinckrodt plc in 2014, Questcor had planned an additional 5% increase for Acthar in December 2014.  This would have meant a total percentage increase of 10% for the year.

135.    However, after the acquisition, Mallinckrodt raised the planned increase to 8.9%, or 13.5% for the year.

136.    On December 14, 2014, Mallinckrodt notified Express Scripts of the impending 8.9% price increase.

137.    In the interim, the Executive Committee ("EC") of Mallinckrodt met.  The EC consists of the senior management of Mallinckrodt, including President and CEO Mark Trudeau and Executive Vice President and Chief Commercial Officer Hugh O'Neill.

138.    COO O'Neill raised the matter of the 8.9% price increase with the EC on Friday

December 12, 2014, and it was decided by the Mallinckrodt leadership team to "change[] the magnitude" of the pricing action, reducing the proposed increase from 8.9% to 2%. The EC did this in order to take advantage of a future "opportunity for breakthrough pricing strategies" in the future.

139.    It is believed and therefore averred that such pricing opportunity was presented by the Synacthen acquisition.

140.    As described more fully below, under the section titled the "Mallinckrodt Synacthen Acquisition", Mallinckrodt completed its acquisition of Synacthen in 2013.

141.    As a result of such Synacthen acquisition, and the existing express agreements and implied understandings with the Express Scripts Entities that Synacthen would not be brought to market to threaten the established Acthar monopoly prices, Mallinckrodt was confident that reducing the planned 8.9% Acthar price increase in late 2014 to little more than the consumer price index [which stood at about 1.7% in 2014] -- causing a $26 million shortfall in the forecasted revenues [based on the 5% increase that was "baked in" for December] -- would not negatively affect the company moving forward.  This decision, while ostensibly made against Mallinckrodt's economic self-interest, was made to further enhance the monopoly profits of all Defendants in the long run.

142.    Accordingly, with the direct input and hands-on decision-making by President and CEO Trudeau, Mallinckrodt reduced its December 2014 Acthar price increase to 2%.  This led to a WAC increase to $32,260.00 and an AWP increase to $40,325.00, respectively, on December 16, 2014.

143.    Due to its already announced intention to effectuate an 8.9% price increase, Mallinckrodt had to correct its prior notice to Express Scripts.  However, Express Scripts agreed

with both decisions, even though the lower price increase was far better for Express Scripts' direct customers and indirect purchasers, like Acument, than the announced 8.9% price increase.

144.    Mallinckrodt then notified the other Express Scripts Entities, as well as the pricing compendia that published its AWP for Acthar, of the new price increase.

145.    Under Mallinckrodt plc's stewardship, the AWP of Acthar continued to rise in to well above $40,000, while Acument was paying for it.

146.    Remarkably, Mallinckrodt's CEO, Mark Trudeau, deliberately lied to the public in a press release, directly responding to Rockford's and Acument's claims against the Defendants.  He willfully misrepresented that "[t]he current 'list price' per vial for the drug is $36,382, not the higher numbers which have appeared in various reports, and Mallinckrodt discounts this list price to both public and private payers."  *See* Mallinckrodt's June 29, 2018 Press Release H.P. Acthar® Gel Value to Patients attached hereto as Exhibit "C".

147.    The price paid by "private payers" like Acument is the AWP.  As set forth above, that price has been in excess of $40,000 since 2014.  Mallinckrodt does not "discount" that price to Acument, or any other private payer, as claimed.

148.    If Mr. Trudeau was actually representing that the WAC for Acthar was $36,382 as of June 2018, which is not the end payer price paid by private payers like Acument, then the AWP paid by private payers was actually a staggering $45,477.50, based on the historical 25% markup Mallinckrodt has employed for its Acthar AWPs!

149.    Since the acquisition of Acthar in 2001, the end payor price of Acthar has grown a over 100,000% reflecting the precipitous rise in the value of the Acthar assets from $100,000 in 2001 to $5.9 billion in 2014 – a 5,899,900% increase in value. The dramatic increase in value of the Acthar assets, coupled with the durable and repeated ability to raise the price of Acthar,

31

underscore the monopoly power wielded by Mallinckrodt in the ACTH market.  Mallinckrodt's tactics described in this Complaint, however, reflect Mallinckrodt's willingness to undertake actions to maintain and grow its monopoly in the ACTH market, in violation of the antitrust laws.

150.    Mallinckrodt has continued to deceive payors like Acument and the public about the actual prices of Acthar, and the reasons for its many price increases.

151.    In fact, in direct response a lawsuit filed against Mallinckrodt in April 2017, Mallinckrodt issued a public statement, claiming to "set the record straight" about Acthar pricing and other issues.  *See* Mallinckrodt's June 29, 2018 Press Release H.P. Acthar® Gel Value to Patients attached hereto as Exhibit "C".  This Press Release is replete with misrepresentations and deliberate falsehoods that only continues to try deceive the public about Acthar pricing and reasons for the high Acthar prices.

152.    Defendants named herein all conspired and agreed to conduct a fraudulent scheme and conspiracy to deliberately inflate the AWPs for Acthar and to maintain such high AWPs for Acthar in the face of complaints by patients and payors, like Acument.  As Defendants well know, the AWP is used by government and private assistance programs for prescription drug reimbursement.

153.    Government and private assistance programs have used the AWPs published in pharmaceutical industry publications, such as the Red Book and Medispan, for years as a basis for reimbursement, in whole or in part.

154.    These publications set forth the AWP for Acthar.  However, in periodically announcing the AWPs for Acthar, the publications simply published the prices that were supplied to them by the Mallinckrodt, as agreed to by Express Scripts.  These Defendants knew

that they could, and did directly, control and raise the AWP for Acthar at any time simply by forwarding to the pricing compendia a new and higher AWP.

155.    This scheme allowed the Defendants to control, as part of their sales, marketing and distribution strategies, their respective profit levels by the direct manipulation of the Acthar AWP.

156.    Years before Defendants engaged in their scheme to increase their monopoly profits, in 2003, the Office of Inspector General ("OIG") admonished, "[i]f a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated." *In re Pharm. Ind. Average Wholesale Price Litig.*, 491 F.Supp. 2d 20, 39-44 (D. Mass. 2007). Ironically, this published decision appeared the same month that Mallinckrodt and Express Scripts signed their first of many conspiratorial agreements to manipulate the AWP for Acthar.

157.    Thus, as of 2003, the OIG had made it clear to prescription drug manufacturers, like Questcor, that the deliberate manipulation of AWP put the company at potential risk under the federal anti-kickback statute. *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 FR 23731-01 (May 5, 2003).

### The Views of Express Scripts' Chief Medical Officer, Dr. Steve Miller, on Express Scripts' Market Power

158.    Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar. When Mallinckrodt chose to increase the price of this 50-plus year old medication, Express Scripts did not push back. Instead, when confronted with the 2007 price increase, Express Scripts' Chief Medical Officer Steve Miller stated that "[t]he increase was a

manufacturing decision.  I can't comment on it."9

159.    The circumstances of this case demonstrate why Dr. Miller chose to stay silent in the face of Express Scripts' decision to join Mallinckrodt in overcharging payors for Acthar.

160.    Express Scripts' Director of Network Audit in Supply Chain, Greg Blaies, has stated under oath that "Express Scripts' mission is to make prescription drugs safer and more affordable for its clients and their members.  Express Scripts provides value to its client health plans by reducing waste and inefficiency in prescription drug spend."

161.    However, in the case of Acthar, Express Scripts did the opposite: it conspired and agreed with the manufacturer of Acthar to raise the prices of Acthar, to the substantial detriment of its clients, and other third party payors, like Acument, who pay for the Acthar supplied by Express Scripts directly to its members.

162.    By the time Acument's Patient was prescribed Acthar, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions. CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program.  As Mallinckrodt's exclusive agent, Express Scripts had no interest in lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer.  In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt realized greater profits at the expense of payors, like Acument.

163.    On May 19, 2017, just weeks after Mallinckrodt and Express Scripts had been sued by the City of Rockford in early April 2017 for, inter alia, price fixing, Express Scripts senior officers made comments about the "somewhat controversial" drug Acthar on a private

_____

9 *Freudenheim*, *supra*.

34

investor conference call hosted by Citi. [10] The Citi interviewer stated, "it's been in the news as – given the pricing around the drug over the past – I don't know – 12 months at least," and then asked for "any thoughts around … how that can be managed and how you see cost of the playing out?" Citi Transcript at 12.

164.     In response, Express Scripts' Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville stated:

> I don't think [Acthar is] a very great [drug] – ***it's a pretty poor drug with a very limited need*** and certainly [Express Scripts Chief Medical Officer, Dr,] Steve [Miller] could comment.  He's a doctor and I'm just a really bad pharmacist.
>
> …[Y]ou know, and Steve, you could chime in here too, but I think Steve and I both would agree, and ***I think everybody in our company would agree, that the product is vastly overpriced for the value***. ***We don't set the price.***  We've told [Mallinckrodt] that. I personally told [Mallinckrodt's] management team that their drug is hugely overpriced. I know Steve has as well.

Citi Transcript at 12 (emphasis added) (brackets added).

165.     Many of these statements were false, misleading and deceptive when made.  They were made willfully, in order to deceive the public and payors, like Acument, who were paying the "vastly overpriced", inflated AWPs for Acthar, as set by both Mallinckrodt and Express Scripts under exclusive agreements concealed from the public through confidentiality provisions in the agreements.

166.     What was true is that Acthar had a "very limited need".  But Express Scripts did nothing to limit the prescription approval (through Accredo), the distribution (through CuraScript), or the coordination of payment (through UBC) for Acthar, because it was making money off the monopoly profits realized by the "vastly overpriced" Acthar sales.

---

[10] *See* Conference Call Transcript of call hosted by the Citigroup Healthcare Team on May 19, 2017 at 11:00a.m. est, with Dr. Steve Miller, Chief Medical Officer from Express Scripts, and Mr. Everett Neville, Senior Vice President of Supply Chain and Specialty ("Citi Transcript") at https://ir.citi.com/l2GW3%2FspXqa99R2rvpFJS8QKZpf%2BRi62n5DFshd7bPciqQPr7uiAlekB%2FjbbEhWR

167.     Mr. Neville also made deliberate, willful misrepresentations about the roles of CuraScript and UBC in the maintenance of Mallinckrodt's monopoly and price fixing schemes.

168.     As for UBC, while he admitted that Express Scripts "interacts" with Acthar through UBC, he claimed that UBC only "does pharma services [like] running the patient assistance program, pre-screening drug program [t]hat is for patients that meet a need-based criteria for poverty."  Citi Transcript at 12 (brackets added).  Clearly, as set forth above, UBC does much more in its central role as the hub of the Express Scripts/Mallinckrodt relationship and the sole operator of the ASAP.

169.     As for CuraScript, while Mr. Neville admitted that Express Scripts "interacts" with Acthar through CuraScript, he sought to deliberately conceal the exclusive distribution arrangement, claiming "[w]e wholesale the drug, i.e., we sell it to physicians, for office use, which is where most of this [Acthar] is used.  We don't control the criteria whether the drug is used or not used or paid or what [is] paid.  We merely serve the same role that an ABC [AmerisourceBergen] or a Cardinal or McKesson would in supplying a product with a very minimal markup to a physician.  That's it."  Citi Transcript at 12 (brackets added).

170.     Clearly, as set forth above, CuraScript does much more as the exclusive distributor of Acthar for Mallinckrodt, shipping the drug directly to patients, not their doctors, and charging the patients and their third-party payors, not the doctors, for the drug.  CuraScript also applies more than a "minimal markup" to Acthar's price charged to third party payors, like Acument.

171.     Finally, Mr. Everett sought to willfully deceive the public and consumers of Acthar by stating, "[t]his is a drug that has very little impact in our company."  Citi Transcript at 12.  In conspiring and agreeing with Mallinckrodt to raise and fix the AWP-based prices of

Acthar to exorbitant, anticompetitive levels, and in conspiring and agreeing with Mallinckrodt to keep Synacthen off the market to maintain and enhance Mallinckrodt's monopoly, Express Scripts worked to protect its share of the Acthar monopoly profits, the loss of which would have had a huge "impact" on the Express Scripts Entities.

172.    On the same conference call, Dr. Miller stated that he was in "100% agreement with [Mr.](Everett)."  Citi Transcript at 12 (brackets added).  Then, he added, "[i]f you look at the data, the indications for the drug are really – while it had, in the compendium, it's listed under a lot of indications, its real use should be very, very limited.  It's an old drug.  There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management."  Citi Transcript at 12-13.

173.    Despite this express acknowledgment by Express Scripts' Chief Medical Officer, in the weeks and months following Mallinckrodt's settlement with the FTC, Express Scripts did not act to contain costs, to limit prescriptions of Acthar where it has not be shown to be effective, or to provide a reasonable alternative for Acthar, such as the Synacthen Depot owned by Mallinckrodt.

174.    Indeed, it was not until December 21, 2017 that Express Scripts provided an updated "Prior Authorization Policy" for Acthar, effective January 2018 (hereinafter "2018 Prior Authorization Policy") – far too late to save payors like Acument from the exorbitant overcharges it suffered in 2015 and 2016 as a result of the conspiracy between Mallinckrodt and Express Scripts, with the substantial assistance of Dr. Tumlin.

175.    As discussed more fully below, Dr. Tumlin prescribed the Acthar to Acument's Patient for the treatment of nephrotic syndrome, specifically idiopathic membranous nephropathy (iMN), and also produced the "limited data" on the use of Acthar for such treatment

which Express Scripts' senior management now was rejecting.  See 2018 Prior Authorization

Policy at 6 ("very limited data have studied the use of Acthar, in patients with diagnoses

including idiopathic membranous nephrology (iMN)…", citing articles published by Dr.

Tumlin).

176.    It is believed and therefore averred in his role as Express Scripts' Chief Medical

Officer, Dr. Miller reviewed and approved of the updated 2018 Prior Authorization Policy.

177.    In that update, Express Scripts finally, affirmatively admitted all the following

facts about Acthar, in particular that it should not have been "recommended for approval" by Dr.

Tumlin for treatment of iMN in Acument's Patient for more than a year:

a. "Initial approval of Acthar in the US was in 1952.  At that time, original **approval only required** that the medication was safe for human use."  2018 Prior Authorization Policy at 4 (emphasis supplied)

b. "Other reviews have been published regarding nephrotic syndrome but do not mention use of Acthar or note that experience with the agent is **far too preliminary**."  *Id*. (emphasis supplied)

c. "The recommended authorization criteria address the use of Acthar in infantile spasms and MS exacerbations in adults.  Regarding Acthar's other uses [like nephrotic syndrome and iMN], **data and guidelines do not suggest** that Acthar has a substantial role in therapy.  Further data are needed before use in other areas can be recommended."  *Id*. (emphasis supplied)(brackets added).

d. In its "Policy Statement", Express Scripts stated, "[p]rior authorization is recommended for prescription benefit coverage of Acthar.  The recommended authorization criteria address the use of Acthar in infantile spasms and MS exacerbations in adults."  But even as to these limited indications, "[a]ll approvals are provided for one month in duration, where 1 month is equal to 30 days, unless otherwise noted below."  *Id*. at 5.

e. Under a heading titled, **"Conditions Not Recommended for Approval"**, Express Scripts expressly listed **"Treatment of Nephrotic Syndrome"**.  *Id*. at 6.  That section further explained as follows:

The prescribing information for Acthar states that it may be used in an edematous state, such as to induce a diuresis or a remission of proteinuria in

the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.  (citing the January 2015 H.P. Acthar Gel prescribing information as its source).  However, **very limited data in nephrotic syndrome have studied the use of Acthar, in patients with diagnoses including idiopathic membranous nephropathy (iMN),** membranoproliferative glomerulonephritis (MPGN), focal segmental glomerulosclerosis (FSGS), minimal change disease (MCD), immunoglobulin A (IgA) nephropathy, class V SLE glomerulonephritis, and monoclonal diffuse proliferative glomerulonephritis.  **Other data in nephrotic syndrome are available regarding use of a synthetic ACTH analog that is available in Europe (tetracosactide [Synacthen Depot]).**  *Id.* at 6 (emphasis supplied)(brackets in original).

178.    Express Scripts expressly took issue with Dr. Tumlin's published data about the use of Acthar for the treatment of nephrotic syndrome in articles published in 2011[11] (when Dr. Tumlin started Acument's Patient on Acthar) and 2013.[12]  This is the same data that Mallinckrodt provided to its sales representatives to promote the use of Acthar for the treatment of nephrotic syndrome.

179.    It is significant that Express Scripts only made these factual admissions about the lack of efficacy of Acthar to treat nephrotic syndrome after it lost the exclusive distribution rights to Acthar in late 2017, after it was sued by the City of Rockford and Acument.

180.    Dr. Miller, Express Scripts Chief Medical Officer, has articulated the power of Express Scripts in the prescription drug marketplace to extract lower prices for its customers, using its tremendous buying power and influence.  He has made all of the following public comments:

---

[11] Tumlin J, Galphin CM, Rovin BH.  Advanced diabetic nephropathy with nephrotic range proteinuria: a pilot study of the long-term efficacy of subcutaneous ACTH gel on proteinuria, progression of CKD, urinary levels of VEGF and MCP-1.  *J Diabetes Res.* 2013; 2013:489869 ("Tumlin 2013 Pilot Study").

[12] Bomback AS, Tumlin JA, Baranaski J, et al.  Treatment of nephrotic syndrome with adrenocorticotropic hormone (ACTH) gel.  *Drug Des Devel Ther.*  2011; 5:147-153 ("Tumlin 2011 Study").

"When I joined the company, we represented 12 million members.  We're at 85 million today.  That gives us extraordinary sway in the marketplace.  If you think about any other aspect of health care, no one else has that many lives that they can represent."[13]

 "We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies.  If any pharmacy chain ever becomes too large, we're able to move our patients and … get the lowest cost."[14]

 "I think that because of the continued escalation of cost, you need a PBM now more than ever.  And what a best-in-class PBM like Express Scripts does really ensure is great health outcomes and more affordable costs."[15]

"Pharma has shown that they feel very emboldened with their pricing power.  We're using our clout in the marketplace to really tamp these down for our clients."[16]

"There are pharma companies that recognize this is in their best interest," he says.  "They, like us, want to get to a sustainable marketplace.  They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage."[17]

---

[13] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[14] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co

[15] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[16] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases," by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases/

[17] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

"Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding.  Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine.  As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible."[18]

"…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible.  For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug.  In doing so, we were able to provide 50,000 patients affordable access to this medication."[19]

"The biggest problem is not new expensive drugs but repricing old ones, and not just ones being purchased by Martin Shkreli or Valeant. 'You have no new research.  You have no innovation.  You have nothing but increased drug prices."[20]

"We are constantly trying to be vigilant and chase the bad actors out of the marketplace."[21]

181.    Through such statements, Express Scripts acknowledged its strong influence on

---

[18] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

[19] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

[20] *Forbes, Pharma & Healthcare*, "Solving Pharma's Shkreli Problem," by Matthew Herper, January 20, 2016, https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#6dcce78c6be3

[21] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017,
https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html

pharmaceutical markets.  The striking feature of the current circumstance is that Express Scripts has not asserted its influence to effectuate lower prices for Acthar.

182.     While acknowledging the lack of "value" of the medication does not warrant its high prices, Express Scripts has facilitated, rather than forestalled, Mallinckrodt's desire for ever growing profits by "repricing" an "old drug".

183.     Ironically, just one month after Express Scripts was sued by the City of Rockford in April 2017 for antitrust, Dr. Miller appeared on CNBC's program "Squawk Box".  On May 31, 2017, Dr. Miller stated, "when there's competition in the marketplace, we [Express Scripts] do a great job of holding down prices.  When we have competition in the marketplace, we are able to play them [the drug companies] off against each other." 22

184.     On the same program, in direct response to a line of questioning about the increased pricing of Mylan's Epipen, Dr. Miller further stated as to Epipen:

> It's a 100 year-old drug in a 20 year-old pen that used to be $95 for a two-pack.  Over the course of several years, they raised the price to $600. So, only one company controls that, that's the manufacturer.

> So, what really works is when we [Express Scripts] can move market share, we can bring prices down.  You guys saw this in Hepatitis C.  When we got competition into the marketplace, the market worked.  We brought the price of Hepatitis C down by over 50%.  It's actually cheaper in the United States then it is in Europe.  So, that's when the market really is working.

185.     The situation described by Dr. Miller about Epipen is similar to Acthar in that one drug manufacturer "controlled" the product.  However, with Acthar, unlike Epipen, the manufacturer went to the largest payor representative, Express Scripts, conspired and agreed to preclude competition in the marketplace, to maintain and enhance monopoly power and to continue to fix and raise prices without issue.

---

22 https://www.cnbc.com/video/2017/05/31/competition-is-key-to-contain-drug-prices-dr-steve-miller.html?hootPostID=a33432e4e0f1a67ae2bd68ae4bdf65d6

186.     In an article published by Forbes Magazine on February 8, 2016, titled "Solving Pharma's Shkreli Problem", Dr. Miller was presented with the problem of "repricing" old drugs, like Acthar and "the ones being purchased by Martin Shkreli or Valeant", including Turing's Daraprim.  He responded, "[y]ou have no research.  You have no innovation.  You have nothing but increased drug prices."   What Dr. Miller failed to acknowledge publicly is that the increased prices of Acthar we caused due in large part to Express Scripts' decision to withhold its market power to effectuate lower prices for Acthar by its exclusive agreements with Mallinckrodt to set the prices of Acthar at anticompetitive levels.

### THE MALLINCKRODT SYNACTHEN ACQUISITION AND EXPRESS SCRIPTS' ROLE IN THE MAINTENANCE OF MONOPOLY PRICING FOR ACTHAR

187.     Since 2007, Acthar has provided the vast majority of Mallinckrodt's revenue. Acthar was so important to Questcor that its then-CEO, Don Bailey announced publicly on multiple occasions that Questcor "is basically a single product company."23

188.     Through its exorbitant price increases, Mallinckrodt was able to grow its revenue from Acthar sales from less than $1 million in 2001 to $798.9 million in 2013.  Much of this increase occurred between 2011 and 2013 when Mallinckrodt's revenues increased $218.2 million to $798.9 million.

189.     However, by 2013, Mallinckrodt had identified a competitive threat.  Novartis AG ("Novartis") had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly.  While it was used outside the United States, it was not yet approved by the FDA for use in the United States.

---

23 Exhibit 99.1 to Questcor form 8-K, Aug. 11, 2011 Canaccord Genuity Conference Transcript at 1; *see also* UBS Investment Bank's Global Life Sciences Conference, Sept. 19, 2011, Transcript at 2 (wherein CEO Bailey stated "Questcor is a single-product company" and affirmed "this presentation was filed with the SEC on [September] 9th").

Recognizing that the entry of Synacthen in the U.S. market for ACTH drugs would threaten its exercise of its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009. It failed.

190.    As of 2013, Novartis agreed to sell Synacthen to Retrophin, Inc., which at the time was helmed by Mr. Shkreli. Mr. Shkreli founded Turing (the maker of Daraprim) after he departed Retrophin.

191.    When faced with a competitive threat to its monopoly, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by three competitors, including Retrophin. Retrophin had agreed to buy Synacthen for $16 million. Upon learning of this imminent threat, Mallinckrodt acted to protect and enhance its monopoly power by licensing Synacthen for a minimum of $135 million from Novartis. It licensed the U.S. exclusive rights to Synacthen from Novartis, not to bring this viable synthetic alternative to Acthar to market, but to eliminate the nascent competitive threat posed by an independently owned Synacthen.

192.    Acquiring Synacthen allowed Mallinckrodt to maintain and enhance its monopoly power in the ACTH market by removing a competitive threat from the marketplace. The Synacthen acquisition had the purpose and effect of suppressing competition and allowing Mallinckrodt to continue to raise prices for Acthar, which it did.

193.    From 2013 through 2017, Mallinckrodt raised the price of Acthar from $36,144 to $43,658.

194.    But Mallinckrodt could not have gotten away with increasing its monopolistic prices without the express written consent of Express Scripts, as required by the parties' contracts. Accordingly, Express Scripts had to agree with Mallinckrodt to allow it to not bring

Synacthen to market.

195.    While the details of this consent are not yet known, and can only be discovered by Plaintiff through discovery in this case, this much is known.

196.    As the largest PBM in America, and the exclusive distributor of Acthar for Mallinckrodt, Express Scripts knew that Mallinckrodt had acquired Synacthen Depot from Novartis.  It is believed and therefore averred that Express Scripts also knew at the time of the Synacthen acquisition that there were other bidders for Synacthen, who were expecting to bring the product to market to directly compete with Acthar.

197.    Certainly, after Retrophin sued Mallinckrodt in January 2014, which lawsuit is discussed below, these facts were known to Express Scripts.  And yet, Express Scripts did nothing to force Mallinckrodt to bring Synacthen to market to compete with Acthar to lower Acthar prices for the benefit of its direct-purchasing customers, like Rockford, and indirect purchasing customers, like Acument.

198.    Instead, Express Scripts continued its unlawful conspiracy and agreements with Mallinckrodt to maintain inflated monopoly prices for Acthar, unchallenged by Synacthen competition.

199.    In its 2018 Prior Authorization Policy, Express Scripts acknowledged that "[o]ther data in nephrotic syndrome are available regarding use of a synthetic ACTH analog that is available in Europe (tetracosactide [Synacthen Depot]).  Id. at 6.  And yet, Express Scripts did not utilize its substantial market power for force the competition that its Chief Medical Officer Dr. Miller affirmed is critical to lowering drug prices, as it did in the case of Daraprim discussed above.

## THE QUI TAM WHISTLEBLOWER COMPLAINT AGAINST MALLINCKRODT

200.    On April 30, 2019, CNN reported that the United States Department of Justice ("DOJ") had intervened in a false claims act action brought by two former employees of Mallinckrodt.

201.    The intervention actually took place the month before, on March 6, 2019, but the case was sealed at the time. *See Plaintiff Under Seal v. Defendant Under Seal*, Civil Action No. 12-CV-0175-BMS, E.D.Pa., at Dkt. No. 55.  The government's decision to intervene, a relatively rare occurrence, was done after the government conducted its own extensive investigation of the claims by the former employees and concluded that the allegations are credible.

202.    The case, now known as U.S. ex. Rel. Charles Strunck and Lisa Pratta, was filed in 2012 by Charles Strunck, New York-based former Multiple Sclerosis ("MS") Sales Specialist for Questcor, and Lisa Pratta, a New Jersey-based Acthar neurology specialist for both Questcor and Mallinckrodt (collectively, the "Relators").  Strunck worked from September 2010 through August 2011, while Pratta worked from September 2010 through June 2017.

203.    As reported by CNN, and as averred in their Qui Tam Complaint, the Relators allege that Mallinckrodt has engaged in a long—standing scheme to bribe doctors to prescribes Acthar at the exorbitant, inflated prices detailed herein.  They claim there was a "culture" at Mallinckrodt designed to sell Acthar at all costs, from lying to the FDA to offering bribes to doctors.

204.    Importantly, Mallinckrodt has not denied the allegations.  Instead, Mallinckrodt claims the conduct alleged is a "legacy matter" involving Questcor and its conduct prior to Mallinckrodt's acquisition.

205.    However, Relator Pratta, who worked at both Questcor and Mallinckrodt after the

46

2014 acquisition, has alleged that the conduct continues at Mallinckrodt.

206.    In a conference call with investors held May 7, 2019, CEO Mark Trudeau publicly stated that the company has reserved for the settlement of the Relators' case and is actively pursuing settlement which he stated is "likely to resolve sooner than later".

207.    The conduct alleged by Relators involved kickbacks to doctors in the form of free Acthar, as well as active concealment by Mallinckrodt of the conduct for years.

208.    For this reason, Acument did not know and could not have known about such unlawful conduct until the earliest date of April 30, 2019.  As a result, Plaintiff's claims stated herein premised upon the unlawful conduct revealed by the Relators' case are timely.

209.    Plaintiff had no way of knowing that Mallinckrodt was paying doctors in Tennessee thousands of dollars to prescribe Acthar to their patients.

210.    The kickback scheme involved the promotion of Acthar to treat disease states for which Acthar was not the "gold standard", as in the case of IS, and for treatments that were not covered by the Acthar label.

211.    For instance, Acthar is approved to treat acute exacerbations of disease.  But the scheme uncovered by Relators involved widespread promotion of Acthar for the long-term treatment of disease.

212.    In the case of Acument's beneficiary, they have been prescribed Acthar for years to treat nephrology syndrome.  As a result of Mallinckrodt's promotional effort, instead of treating Acument's beneficiary for an acute exacerbation, or flare-up, they have been treated with Acthar as maintenance medication for more than a year.  Acument was forced to pay hundreds of thousands of dollars for Acthar.

213.    The conduct revealed by the Relators goes to the manner in which Mallinckrodt

was able to convince doctors to prescribe the high-priced Acthar, after the Defendant' conspired and agreed to raise the prices and maintain the prices at artificial levels.  The conduct involved systematically promoting and marketing Acthar for unapproved off-label uses, including the nephrology syndrome for which Acument's beneficiary was prescribed Acthar.

214.    The scheme involved compensating sales representatives thousands of dollars to promote the sale of Acthar for unapproved uses and doses, to benefit Mallinckrodt and the sales reps.  Sales representatives have been paid tens of thousands of dollars for such promotional efforts.  As detailed in the Relators' complaint, one sales representative was paid a $124,000 bonus in the second quarter of 2011, including $75,000 for just one month.  Others received bonuses of $110,000 and $80,000 in the same period.

215.    The compensation of sales reps was directly tied to sales growth, a growth that was possible by expanding the approved uses for Acthar which had a narrow, limited market of patients.

216.    Mallinckrodt employed a team of "Medical Science Liaisons", like Sagar Shah, who were directed by Nikki Mutschler to join with sales specialists, like Strunck and Pratta to promote the sale of Acthar for unapproved uses.

217.    To hide the fact that the promotional effort was for unapproved, off-label uses, Mallinckrodt referred to such uses as "new indications."

218.    The sales of Acthar for these "new indications" became a primary focus for Mallinckrodt, as it strived to grow its revenue to the more than $1 billion in sales it achieves each year for Acthar alone.

219.    Mallinckrodt achieved such exponential growth, despite the price increases detailed herein, by providing valuable remunerations to doctors to induce and encourage them to

48

prescribe Acthar for unapproved uses and doses.

220.     As the Relators' Complaint reveals, and as Acument alleges herein, Mallinckrodt engaged in such conduct in violation of the Tennessee laws by providing secret kickbacks to doctors throughout the country, including Tennessee, to get them to prescribe Acthar at exorbitant prices, which Acument has been forced to pay, and continues to pay to this day.  As detailed herein, Dr. Tumlin received hundreds of thousands of dollars from Mallinckrodt to prescribe Acthar.  That is why Plaintiff seeks declaratory and injunctive relief against Mallinckrodt to end such practices.

### RELEVANT MARKETS, MONOPOLY POWER, AND THE FTC COMPLAINT AGAINST MALLINCKRODT

221.     The supra-competitive and exorbitant prices that Mallinckrodt and Express Scripts charge for Acthar, and Mallinckrodt's limitation on distribution through the entry into an exclusive distribution arrangement with Express Scripts in 2007, are direct evidence of Mallinckrodt's monopoly power and actions to maintain and enhance such monopoly power, in violation of the antitrust laws.  That Acthar holds a dominant share of the relevant market for ACTH drugs in the United States shows Mallinckrodt's monopoly power by indirect evidence.

222.     The exercise of such monopoly power is also shown by Mallinckrodt's acquisition of Synacthen, and decision, without pressure from Express Scripts, to keep Synacthen off the market to maintain and enhance its monopoly prices for Acthar.

223.     The relevant product market is the sale of ACTH drugs, dominated by just one product, Acthar.  The geographic market for purposes of this case is the State of Tennessee, as part of the larger United States market, but governed by the antitrust laws of this State.  In this market, Mallinckrodt is the single seller, and the third party payors are the leading buyers.

224.     That market is and has been characterized by significant barriers to entry.

225.    There are no medical or reasonably available substitutes for Acthar.  The only potential substitute was Synacthen, which Mallinckrodt purchased the rights to from Novartis in 2013, only to shelve the product, with the consent of Express Scripts, rather than seek to bring it to market in the United States, and specifically to the Tennessee market.

226.    On January 18, 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt, alleging that Mallinckrodt exercised, and continues to exercise, monopoly power in the United States in the sale of Acthar.  See generally, Complaint for Injunctive Relief and Other Equitable Relief ("FTC Complaint") at Exhibit "D" hereto.

227.    The FTC alleged that such purchases "extinguished a nascent competitive threat to [Mallinckrodt's] monopoly."  FTC Complaint, ¶ 1.

228.    At all relevant times material to this case, Mallinckrodt possessed monopoly power—the ability to profitably raise price significantly above competitive levels without losing significant sales—in the relevant product market.  None of the vast price increases taken by Mallinckrodt between 2007 and the present have caused a significant loss of sales.  To the contrary, Mallinckrodt's sales have increased during that time.

229.    Mallinckrodt has repeatedly and profitably raised Acthar's price from the time it acquired the product for $100,000 in 2001 from Aventis to the present.  Mallinckrodt has been able to raise prices unchecked, as set forth above, and achieve corresponding revenue growth to more than $1 billion.

230.    Mallinckrodt has encountered no competitive constraints on its ability to repeatedly increase Acthar's price and, by extension, its revenue and profit margins. Mallinckrodt does not set the price of Acthar in reference to the price of any of the other drugs that are prescribed to treat the same indications that Acthar treats.  Acthar is priced significantly

higher than non-ACTH drugs used to treat the same indications, except for IS.

231.    Indeed, one Mallinckrodt executive, Steve Cartt, commented that the price for Acthar "was chosen by looking at the prices of other specialty drugs and estimating how much insurers and employers would be willing to bear."  According to Cartt, Mallinckrodt took "some comfort that the strategy would work, and physicians would continue to use the drug, and payers would continue to pay."  In fact, according to Cartt, the "reality was better than expected."

232.    In its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2007, Questcor illustrated the effect of its monopolization strategy on its "5 Year Cumulative Total Return", illustrating a 290% return between 2006 and 2007 as follows:



Comparison of 5 Year Cumulative Total Return*
Among Questcor Pharmaceuticals, Inc.,
the Amex Composite Index
and the Nasdaq Pharmaceutical Index



COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Questcor Pharmaceuticals, Inc., The AMEX Composite Index
And The NASDAQ Pharmaceutical Index





|  | Cumulative Total Return* | | | | | |
|---|---|---|---|---|---|---|
|  | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| QUESTCOR PHARMACEUTICALS, INC. | 100.00 | 75.51 | 54.08 | 106.13 | 151.02 | 588.78 |
| AMEX COMPOSITE INDEX | 100.00 | 143.18 | 175.20 | 215.26 | 257.04 | 299.37 |
| NASDAQ PHARMACEUTICAL INDEX | 100.00 | 144.89 | 160.46 | 160.65 | 163.42 | 154.46 |

*   $100 invested on 12/31/02 in stock or index-including reinvestment of dividends. Fiscal year ended December 31.

This stock performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

233.    FDA approval is required to market pharmaceuticals to U.S. consumers.  As a result, drugs sold outside of the United States are not viable competitive alternatives for U.S.

consumers, even in the event of a significant price increase for ACTH drugs available in the United States.

234.    Acthar has a 100% share of the market for ACTH drugs in Tennessee and throughout the United States.  No other ACTH drug is FDA-approved for therapeutic use.

235.    The Tennessee ACTH market, like the larger United States ACTH market, is characterized by high barriers to entry.  Developing a long-acting, depot-injection formulation of a drug product containing ACTH (natural or synthetic) that is stable, safe, and effective would require significant time, cost, and effort, with no guarantee of success. The requirements for entry include sourcing the active pharmaceutical ingredient, formulating a sustained-release depot-injection formulation, scaling production to clinical scale, and successfully conducting clinical trials necessary for FDA approval.  Mallinckrodt's former CEO Don Bailey assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

236.    Former CEO Don Bailey also claimed that one of the barriers to entry is the Acthar drug formulation.  While Acthar is a biologic extraction of porcine pituitaries, Bailey claimed, "[i]t's an undisclosed composition, so that's a trade secret."  He also claimed "[t]he manufacturing process is also a trade secret.  It's complex, it's unique, and we own all elements of the manufacturing process. …The composition of Acthar that comes out of the manufacturing process is tied to the process, so if you don't know the process you can't figure out what's actually in Acthar."

237.    If what the former CEO was saying was that Mallinckrodt enjoyed a natural monopoly, that does not necessarily imply the absence of market constraints.  These constraints can come from a new competitive product, like Synacthen, or from a dominant buyer on the

other side of the market, like Express Scripts.  Both of these factors are relevant here.

**Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only
Competitor Drug, Synacthen**

238.    Synacthen posed a threat to Mallinckrodt's ACTH drug monopoly, so
Mallinckrodt intervened at the time when other firms were attempting to acquire the U.S. rights
to Synacthen from Novartis.  Mallinckrodt submitted a bid that included substantially more
guaranteed money than the other bidders had offered, effectively ending the bidding process.  By
acquiring Synacthen, Mallinckrodt eliminated the possibility that another firm would develop it
and compete against Acthar.

239.    Synacthen constituted a nascent competitive threat to Mallinckrodt 's ACTH drug
monopoly, notwithstanding the uncertainty that Synacthen, a preclinical drug, would be
approved by the FDA.

240.    For years, Mallinckrodt viewed Synacthen as a significant potential competitive
threat to its monopoly.

241.    When Mallinckrodt first decided to pursue an "orphan drug" (i.e., high) pricing
model for Acthar, it recognized the potential threat Synacthen posed to Acthar's revenue growth.

242.    Nevertheless, in 2007, Mallinckrodt adopted and pursued the above-described
"new strategy", consolidating Acthar distribution to just one distributor (Curascript) and
streamlining its control over sales and distribution through the implementation of ASAP (run by
UBC).  These functions were consolidated in one significant company, Express Scripts.

243.    In 2009, Mallinckrodt approached Novartis about acquiring Synacthen.  At that
time, Mallinckrodt continued to view Synacthen as a possible future competitor, especially given
the increasing prices Mallinckrodt was commanding for Acthar.  Unsuccessful in that initial
attempt, Mallinckrodt continued to monitor the competitive threat from Synacthen.

244.    Then in 2012, Mallinckrodt again concluded that Synacthen posed a more immediate threat to Acthar if Synacthen was approved for sale in the United States.

245.    By 2013, Mallinckrodt feared that if another company were to acquire Synacthen and obtain FDA approval, it could undermine its business model.

246.    On information and belief, as long as Mallinckrodt believed no other firm was seeking to bring Synacthen to the United States, Mallinckrodt did not make further attempts to acquire it.  Indeed, just months before Mallinckrodt began pursuing the acquisition of Synacthen, top Mallinckrodt officials questioned whether Synacthen would provide any affirmative value to Mallinckrodt.

### Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly

247.    Unbeknownst to Mallinckrodt at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold.  Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen.  Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

248.    It is alleged that each of the three firms planned to develop Synacthen for IS and to use Synacthen to compete directly with Acthar.  With this indication, each firm expected to capture a significant share of the U.S. ACTH market from Mallinckrodt by pricing Synacthen below Acthar's prices.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. ACTH market.

## The Value of the Synacthen Assets

249.   The Synacthen assets and related rights provide a proven formulation for a long-acting, depot-injection drug containing synthetic ACTH.  The drug product manufactured using the Synacthen formulation has been safely and effectively used to treat patients suffering from IS and other conditions worldwide for decades.  The Synacthen assets would therefore facilitate commercializing a synthetic ACTH therapy in the United States.

250.   The asset package being sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process.

251.   In possession of the Synacthen assets, a buyer would not need to create a synthetic ACTH drug formulation de novo, nor would it need to develop from scratch the manufacturing and testing protocols necessary for production of the drug product.

## Mallinckrodt Disrupted the Synacthen Bidding Process

252.   It is alleged that, on October of 2012, Mallinckrodt learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis to develop it to compete with Mallinckrodt for the ACTH market.  Mallinckrodt immediately reached out to Novartis, signed a confidentiality agreement with Novartis, and submitted a confidential offer for the purchase of Synacthen.

253.   Novartis negotiated with the three alternative bidders in parallel with Mallinckrodt.  By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar.  At the point where those negotiations left off, each company exchanged deal terms with Novartis and submitted formal offers.  The offers by the three alternative bidders were

55

comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. sales of Synacthen.

254.    Unlike the three alternative bidders, Mallinckrodt had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Retrophin ultimately prevailed in the bidding war with a bid of $16 million.

255.    However, on June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Mallinckrodt and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements").  By the Agreements, Mallinckrodt gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries.  Under the Agreements, Mallinckrodt is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

256.    In other words, Mallinckrodt swept in at the eleventh hour to overpay—at least 8 times more than the market had determined—for the only immediate competitive threat to its monopoly for Acthar.  Despite paying this amount, they did not seek FDA approval to bring the product to market.

**The Lawsuit Between Retrophin and Mallinckrodt for Mallinckrodt's Antitrust Violations**

257.    In January 2014, Retrophin sued Questcor (n/k/a Mallinckrodt) for antitrust violations in the United States Federal District Court for the Central District of California.  *See Retrophin, Inc., v. Questcor Pharmaceuticals, Inc.*, CV-14-00026-JLS (C.D.Cal) ("Retrophin Complaint") (attached hereto at Exhibit "E"). (To the extent relevant to Plaintiff's Complaint, the averments of antitrust conduct interposed by Retrophin are incorporated by reference herein).

258.    In the Retrophin Complaint, Retrophin claimed,

> "[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly.  It had negotiated an agreement to purchase

from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen.  ...

Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar.  It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis.  The signing was scheduled for June 11, 2013.  The signing of the agreement was so imminent that a press release had been prepared to announce the deal.

On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen.  In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen.  There was no procompetitive aspect of Questcor's acquisition of Synacthen.

Retrophin Complaint, ¶¶ 4-6, at Exhibit "E" hereto.

259.    The FTC agreed with Retrophin's assessment.

260.    The government, in its 2017 FTC complaint, mirrored Retrophin's 2014 allegations that Mallinckrodt engaged in anticompetitive conduct in violation of the antitrust laws.

261.    Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million, slightly less than the $16 million Retrophin bid to purchase Synacthen from Novartis.

**Mallinckrodt's Acquisition of Synacthen Harmed Competition**

262.    Mallinckrodt's strategy to conspire with Express Scripts and continue to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price.  With the acquisition of Synacthen, Mallinckrodt was able to thwart an imminent threat to its Acthar monopoly and thereby harmed competition.  But it was only

because Express Scripts agreed with Mallinckrodt to not bring Synacthen to market that Mallinckrodt's scheme was successful.

263.    Mallinckrodt claimed at the time that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

264.    In a public statement released by Mallinckrodt on June 29, 2018, in direct response to the Rockford lawsuit, Mallinckrodt admitted "Mallinckrodt did not pursue commercialization of Synacthen for IS."  However, it falsely claimed that the reason for not doing so was because "the barriers to completion were, in our view, virtually impossible to overcome."  See June 29, 2018 Press Release, "The Facts About H.P. Acthar Gel" at Exhibit "C" hereto.

265.    Fourteen months after Questcor acquired Synacthen, Mallinckrodt acquired Questcor for $5.9 billion.  The vast majority of Questcor's value was attributable to Acthar and Synacthen.

266.    However, despite its claims about a willingness to bring Synacthen to market, to date, Mallinckrodt has not brought Synacthen to market for any indication.  Instead, it keeps Synacthen off the market to protect its monopoly power and high prices for Acthar.  Express Scripts continues to allow Mallinckrodt to restrict competition in the market for ACTH products.

### Mallinckrodt Settles with the FTC

267.    On January 18, 2017, the FTC announced that Questcor and its new parent Mallinckrodt plc agreed to pay $100 million to settle FTC charges that Questcor and Mallinckrodt violated antitrust laws when Questcor acquired the rights to Synacthen from

Novartis in 2013.

268.    According to FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the prices of Acthar, from $40 in 2001 (when it acquired the rights to sell Acthar for $100,000) to more than $34,000 per vial today – an 85,000 percent increase."

269.    The brunt of these monopoly prices was borne by self-funded payors, like Acument, located throughout the country, whose employees and beneficiaries whom were at the mercy of Mallinckrodt and treated with Acthar.

270.    From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $45,000.

271.    Remarkably, Mallinckrodt continues to deceive payors like Acument and the public about the true prices of Acthar.  In its June 29, 2018 Press Release, "The Facts About H.P. Acthar Gel" at Exhibit "C", Mallinckrodt claimed that "[t]he price of H.P. Acthar Gel today is $38,892, before discounts provided to payors."  As set forth above, this is demonstrably false and misleading, as Mallinckrodt raised the WAC for Acthar to $31,626.00 on January 16, 2014, 4 ½ years prior, which in turn raised its AWP to $39,532.50 in 2014.  Since that time, Mallinckrodt has raised the WAC multiple times, at least once a year, pushing the AWP to over $45,000.00 in 2018.

272.    Mallinckrodt claimed that these exorbitant price increases were in response to demand.  But its former Chief Executive Officer, Don Bailey, acknowledged in 2009 that "we only have about 800 patients a year.  It's a very, very small – tiny – market."  Consequently, the limited use of the product did not justify an over 58,000% price increase from acquisition until 2009.

273.    Since the Acthar market for the treatment of IS was so limited, Mallinckrodt

sought to expand its use.  By 2012, Acthar was prescribed for Medicare recipients 3,387 times. To Medicare alone, this represented a cost of $141,500,000 in 2012.

274.    Quantified another way, Dr. William Shaffer, a neurologist in Greeley, Colorado who was the highest prescriber of Acthar in 2012, wrote only 78 prescriptions for the drug, but the prescribed Acthar cost Medicare $4,000,000.

275.    Acthar represented 98% or more of Mallinckrodt's sales and revenue from sales since 2007.  Its manipulation of the market has resulted in a 266% increase in revenue year-over-year from 2011 to 2013.  Total net sales for Mallinckrodt in 2011 were $218.2 million, $509.3 million in 2012, and $798.9 million in 2013.  In each of those years, Acthar represented at least 95% of Mallinckrodt's net sales – over $1.45 billion in revenue.

276.    In the words of former CEO Don Bailey "Questcor is basically a single-product company."  But, by flexing its monopoly power, Mallinckrodt has been able to raise Acthar prices and increase revenue from Acthar in a "tiny market" from less than $1 million for fiscal 2001 to $799 million for fiscal 2013 - a nearly 80,000% increase.  It did so in conjunction with Express Scripts.

277.    Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed Express Scripts' competitive pressure in the marketplace to cause Acthar prices to be lower.  Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present.

**Dr. Tumlin's Role in the Acthar Scheme as a Leading "KOL" for Mallinckrodt in the Development and Promotion of Acthar for the Treatment of Nephrology Syndrome**

278.    In order to effectuate their scheme and conspiracy fully, the corporate Defendants

needed some help with the promotion of Acthar to physicians, especially in the medical fields where Acthar was not the preferred course of treatment.  Indeed, Acthar was not approved by the FDA for the long-term treatment of most diseases for which Acthar had a narrow indication from its 1952 label.  One such field was nephrology.

### Mallinckrodt targets nephrology syndrome as a "potential new market" to promote off-label sales of Acthar.

279.    As Express Scripts' 2018 Prior Authorization Policy acknowledged, "data and guidelines do not suggest that Acthar has a substantial role in therapy" for nephrotic syndrome, including iMN.  Instead, "[f]urther data are needed before use in other areas [beyond IS and MS] can be recommended."  Id. at 4 (brackets added).

280.    To overcome this lack of data to support to use of Acthar to treat nephrotic syndrome, and to support its marketing effort in nephrology, Mallinckrodt engaged certain nephrologists strategically situated throughout the country.  These doctors became known as "Key Opinion Leaders" or "KOLs".

281.    Mallinckrodt turned to KOLs initially to determine whether there was a viable potential market for Acthar with nephrologists.

### Mallinckrodt engages KOLs for "white coat marketing" of Acthar to nephrology

282.    The monopoly profits realized by the implementation of the "new strategy" in 2007 made it possible for Mallinckrodt to pay doctors to serve as KOLs as part of the Mallinckrodt white coat marketing strategy into nephrology.

283.    The practice of "white coat marketing" was identified by the Office of Inspector General (OIG) of the federal government as a potential area of fraud and abuse as early as 1991.  See, e.g., OIG Advisory Opinion No. 11-08, issued June 12, 2011, at 6 (citing 56 Fed. Reg. 35952, 35974 (July 29, 1991)).  As described in Advisory Opinion No. 11-08:

The fraud and abuse risks are compounded where, as here, a physician or other health care professional is involved in the marketing activity – a practice sometimes referred to as "white coat" marketing.  White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services – especially when marketing to their patients.  See, e.g., 56 Fed. Reg. 35952, 35974 (July 29, 1991).  Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch.

284.    In order to cultivate KOLs for its white coat marketing scheme, Mallinckrodt directed its sales force call on select nephrologists to discuss their treatment of nephrotic syndrome and to begin sharing the available data on synthetic ACTH treatment.

285.    However, it is believed and therefore averred that the only available data was data relating to the use Synacthen Depot in Europe.

286.    Mallinckrodt then began working with KOLs, like Dr. Tumlin, were interested in generating new data in the United States to support the off-label use of Acthar to treat nephrology syndrome.  This became a major focus for Mallinckrodt in 2009.

### Dr. Tumlin is hired as a Mallinckrodt KOL

287.    By at least March 2009, Dr. James Tumlin was hired by Mallinckrodt to develop supporting data using his existing patients as test subjects in a non-FDA approved clinical study.  Mallinckrodt paid Dr. Tumlin handsomely for such work on behalf of the company.

288.    It is believed and therefore averred that around that time Mallinckrodt entered into a contract with Dr. Tumlin to conduct clinical studies of his patients using Acthar to treat their nephrology syndrome.  This engagement was not to conduct any FDA-approved clinical study.  Instead, it was to pay Dr. Tumlin to conduct clinical studies of his own patients by prescribing Acthar to them for unapproved uses and doses to treat their nephrotic syndrome in order to learn about the effects of Acthar on their disease and assist Mallinckrodt in developing anecdotal data

with which to promote Acthar's use to other nephrologists.  One such patient was Acument's Patient.

289.     The 2009 contracted study was titled "A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study of H.P. Acthar Gel (Acthar) in Treatment-Resistant Subjects With Persistent Proteinuria and Nephrotic Syndrome Due to Idiopathic Membranous Nephropathy (iMN)" (hereinafter, "Tumlin 2009 Randomized Study").  It is believed and therefore averred that Dr. Tumlin "enrolled" 15 patients for this study.  While Acument's Patient had iMN, it is unknown to Acument at this time whether its Patient beneficiary was included among the 15 patients Dr. Tumlin treated with Acthar as part of this contracted study.  Only discovery will reveal the truth.

290.     However, it is known Dr. Tumlin did not charge either the Patient or Acument for the Acthar he prescribed in 2011.  Instead, it is believed and therefore averred that Mallinckrodt provided the drug for free in order that Dr. Tumlin could develop data to assist in its marketing and sales of Acthar to other nephrologists.  Typically, a prescription drug company will not charge patients for the drug used in a clinical study.

291.     Dr. Tumlin's work on behalf of Mallinckrodt became a centerpiece of its marketing plan for nephrologists, not just in Tennessee, where Dr. Tumlin's practice, Southeast Renal Research Institute, was located in Chattanooga, but throughout the country.

292.     It is believed and therefore averred that Dr. Tumlin travelled across the country on all expenses paid trips funded by Mallinckrodt to promote the use of Acthar for nephrology syndrome and other disease states for which there were no clinical studies to support the treatment.  Instead, it is believed that Dr. Tumlin cited his own anecdotal experience with his patients, about which he published in two papers, the Tumlin 2001 Study and the Tumlin 2013

Pilot Study.  See notes 12 and 13 above.

293.    While it is not yet known the total dollars Mallinckrodt paid Dr. Tumlin for these two "studies" which led to published articles, it is believed and therefore averred that those monies were only part of Dr. Tumlin's compensation for working for Mallinckrodt.

294.    For instance, it is known that Dr. Tumlin conducted a study titled "Safety and Efficacy of Acthar Gel on Albuminuria and Urinary Transforming Growth Factor Excretion in Type II Insulin Requiring Diabetics with Nephrotic Range Proteinuria: A Pilot Study".  It is believed that Mallinckrodt paid Dr. Tumlin for that study.

295.    In prior authorization update released by Express Scripts in 2018 – 9 years after Mallinckrodt began white coat marketing of Acthar through KOLs like Dr. Tumlin – Express Scripts admitted that Acthar should not have been "recommended for approval" by any doctor, including Dr. Tumlin, for treatment of iMN in patients.

296.    In fact, Express Scripts cited Dr. Tumlin's 2 published papers sponsored and paid for by Mallinckrodt, the Tumlin 2011 Study and the Tumlin 2013 Pilot Study,[24] in concluding that "very limited data in nephrotic syndrome have studied the use of Acthar, in patients with diagnoses including idiopathic membranous nephropathy (iMN)…".  Express Scripts also pointed to the very same European data studying Synacthen's use in nephrotic syndrome as support for its conclusions that Acthar was inappropriate for the treatment of nephrology syndrome.

297.    It is significant that Express Scripts only made these factual admissions about the lack of efficacy of Acthar to treat nephrotic syndrome after it lost the exclusive distribution rights to Acthar in late 2017, and after it was sued by the City of Rockford and Acument.

---

[24] Bomback AS, Tumlin JA, Baranaski J, et al.  Treatment of nephrotic syndrome with adrenocorticotropic hormone (ACTH) gel.  *Drug Des Devel Ther*.  2011; 5:147-153 ("Tumlin 2011 Study").

298.    It is believed and therefore averred that Dr. Tumlin has been paid handsomely for his work on behalf of Mallinckrodt.

299.    According to the website sponsored by Propublica,25  Dr. Tumlin was paid by Mallinckrodt at least the following disclosed sums for his promotional activity selling Acthar to other doctors throughout the country, apart from the monies he has earned conducting clinical studies of his patients:

| | |
|---|---|
| Aug. 2013 - Dec. 2013 | $15,318 |
| Jan. 2014 - Dec. 2014 | $27,733 |
| Jan. 2015 – Dec. 2015 | $28,839 |
| Jan. 2016 – Dec. 2016 | $50,840 |

300.    As described more fully below, Dr. Tumlin began treating Acument's Patient with Acthar to treat iMN in 2011, but did not charge for the drug.  He renewed the treatment in December 2015 through December 2016, and this time charged the full, inflated AWP price for the Acthar, as established by Mallinckrodt and Express Scripts.

301.    On multiple occasions, Dr. Tumlin was paid twice by Mallinckrodt for the same services and reimbursements.

302.    For instance, on May 23, 2016, Propublica reports that Dr. Tumlin received two payments from Mallinckrodt for "promotional speaking" in the amount of $3,400 each.  He also received two equal payments of $2,050 for "promotional speaking" July 2, 2015.

303.    On June 17, 2015, Mallinckrodt paid Dr. Tumlin the following sums for "travel

---

25 *See* https://projects.propublica.org/docdollars/  According to Propublica, "[p]harmaceutical and medical device companies are required by law to release details of their payments to a variety of doctors and U.S. teaching hospitals for promotional talks, research and consulting, among other categories. Use this tool to search for general payments (excluding research and ownership interests) made from August 2013 to December 2016."

and lodging" for just one day: $537, $529, $393, $393, $276, $87, $50, $50, $30, $30 and $22.

304.    Based on the Propublica information, it is believed that Dr. Tumlin travelled the country for Mallinckrodt to promote Acthar use in nephrology.  Mallinckrodt paid with substantial "honoraria" paid, totaling up to $5,000 at time, for his time and effort.

305.    The specific dates, locations and payments relating to these trips lies within the exclusive control of Mallinckrodt and Dr. Tumlin.  Only discovery will reveal these details to the Plaintiff.

### Acument's Payments for Acthar in Tennessee for Long-Term the Treatment of iMN, and Antitrust Injury

306.    Throughout the relevant time period, Acument has provided healthcare benefits to its employees through Blue Cross Blue Shield of Michigan.  Since 2010, Acument has provided prescription drug benefits for its employees.  At the time, and through 2011 when the Patient was prescribed Acthar, Acument's prescription drug benefits were administered by Express Scripts.  When the Patient was prescribed Acthar a second time in last 2015, Acument had moved to CVS/Caremark for its PBM services.

307.    Acument received no bill from Dr. Tumlin or Express Scripts for the Acthar prescribed to the Patient in 2011.  However, in 2015 through 2016, Acument was billed for Acthar by CVS/Caremark at a discounted priced based on AWP.  The discount CVS/Caremark provided Acument for the Acthar was AWP minus 15.75%.

308.    Acthar paid such AWP-based amounts for the Acthar prescribed to the Patient. These payments totaled $892,017.75, which was the amount due after the Patient paid the $200 co-payment for each of the 13 prescriptions, which were filled between December 17, 2015 and December 6, 2016 at a gross cost of $68,816.75 for ten total dispensed units.  As set forth on the ASAP form, the typical dosage was 10 units; however, Dr. Tumlin prescribed twice that amount

66

for the Acument Patient.

309.   Acument suffered antitrust injury cognizable under Tennessee law because it was charged and paid an artificially inflated and fixed price for the Acthar based upon the inflated AWP for Acthar as set by Mallinckrodt and the Express Scripts Defendants, and as charged by Dr. Tumlin through his submission of the prescription through the ASAP program.

310.   The Acthar was supplied directly to Acument's Patient by the Express Scripts Entities, pursuant to their exclusive agreements with Mallinckrodt.  The Acthar was prescribed to the Patient by Dr. Tumlin, one of Mallinckrodt's leading KOLs in the promotion of Acthar for nephrology syndrome.

311.   As set forth above, the payments made by Acument were sent to its PBM, CVS/Caremark, which then routed the payments to Express Scripts, the exclusive distributor of Acthar and Mallinckrodt's designated, exclusive agent.

312.   Although Acthar was not approved to treat the Patient's condition, in 2011, Dr. Tumlin prescribed Acthar.  However, neither Dr. Tumlin nor the other Defendants charged the Patient or Acument for the Acthar in 2011.  Instead, the therapy ended.  Then, Dr. Tumlin put the Patient back on Acthar in order to charge him and Acument the artificially inflated AWP for Acthar, and to garner monopoly profits for all Defendants charged herein.

## COUNT I
## ACUMENT v. ALL DEFENDANTS
## MONOPOLIZATION OF
## THE ACTH MARKET IN VIOLATION OF THE TTPA

313.   Acument hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

314.   The Tennessee Trade Practices Act ("TTPA") declares unlawful, void and against public policy the following:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article….

Tenn. Code Ann. § 47-25-101.

315.    The TTPA further provides relief to the following persons:

> Any person who is injured or damaged by such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination….

Tenn. Code Ann. § 47-25-106.

316.    Such persons injured may recover "the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust." Tenn. Code Ann. § 47-25-106.

317.    In *Sherwood v. Microsoft Corp.*, 2003 WL 21780975, *29 (Tenn. Ct. App. July 31, 2003), the Tennessee Court of Appeals held that indirect purchasers, like Acument, have standing to bring an action under the TTPA to recover damages resulting from price-fixing. *See Freeman Indus. LLC v. Eastman Chem Co.*, 172 S. W.3d 512, 519 (Tenn. 2005).

318.    Tennessee municipalities and third party payors ("TPPs"), like Acument, have standing to sue within the meaning of Tenn. Code Ann. § 47-25-106. *See Metro. Gov't of Nashville & Davidson Cnty. v. Ashland Oil, Inc.*, 535 F. Supp. 328 (M.D. Tenn. 1982).

319.    Acument paid the artificially inflated prices as set by Mallinckrodt and Express Scripts, and as charged by all Defendants, including Dr. Tumlin, for the Acthar prescribed to its covered Patient. As a result, Acument was injured by the conduct alleged herein.

320.    The transactions at issue in this case were predominantly intrastate in character,

due to the presence of the Plaintiff, its Patient, and most of the Defendants in this State.

321.    The Express Scripts Entities all forged alliances in this State, in particular in Memphis, while Mallinckrodt forged alliances with the Express Scripts Defendants and Dr. Tumlin, situate in Chattanooga.

322.    The Acthar at issue was marketed and sold in this State, was prescribed in this State, was delivered in this State, was administered in this State, and was paid for in this State by the Plaintiff and its Patient.

323.    Accordingly, while certain acts may have occurred outside this State, the arrangements, agreements and understandings between the Defendants had the effect of lessening competition in the sale of articles sold within this State and/or imported into this State.

324.    Such arrangements, agreements and understandings between the Defendants also affected the price to consumers in this State, like Acument and its Patient.

325.    As a result, the illegal conduct alleged herein substantially affected commerce within this State within the meaning of the TTPA.

326.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supra-competitive prices of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.

327.    As a result, Defendants had "arrangements, contracts, agreements, trusts or combinations" between themselves "designated, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer" of Acthar.  Tenn. Code Ann. § 47-25-101.

328.    Further, to maintain these supra-competitive prices, Mallinckrodt acquired Synacthen and refused to bring it to market.  Express Scripts conspired and agreed with Mallinckrodt to keep Synacthen off the market in order to maintain their monopoly profits.

329.    This conduct caused Acument to pay the inflated, AWP-based prices for Acthar that were significantly greater than in a competitive market.  Therefore, Acument is entitled to relief under the TTPA.

330.    Acument was injured as a result of Defendants' conduct in violation of the TTPA, and hereby seeks damages in the amount of "the full consideration or sum paid" for Acthar.

331.    Mallinckrodt has, and at all relevant times hereto, had monopoly power in the market for the sale of ACTH drugs in Tennessee and throughout the United States.  While the genesis of this monopoly power may be natural, since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power in the ACTH market.

332.    Dr. Tumlin has conspired and agreed with his co-Defendants to work with them maintain this monopoly by creating clinical data to promote the off-label uses of Acthar and to charge patients exorbitant AWP-based prices for Acthar.

333.    As described above, Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 patients per year.  However, by 2015, Mallinckrodt was able to grow sales of Acthar to approximately $1.1 billion.

334.    As set forth above, Mallinckrodt's announced a "new strategy" was created in order to maintain and enhance its monopoly.  This new strategy could not have succeeded without the involvement of Express Scripts as Mallinckrodt's exclusive agent, and providers like Dr. Tumlin who are willing and able to advance the prescriptions of Acthar for off-label uses and doses at inflated prices well any purported "value" of the medicine.

**Anticompetitive Act 1: Restricted Distribution**

335.    On July 2, 2007, Mallinckrodt decided to restrict distribution from three

wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to Express Scripts.  The

goal of this strategy was to lock patients into receiving Acthar through one channel and prevent a

competitive product from entering the market.

336.    When Mallinckrodt began its new strategy on July 16, 2007, it established the

ASAP Program.  *See* Exhibit "B". July 2, 2007 Urgent Product Alert H.P. Acthar Gel.  The

ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient to

just one avenue, through Express Scripts.  Mallinckrodt entered an exclusive arrangement with

Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar

directly from patients.

337.    Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP

Program. Through ASAP, UBC facilitated all aspects of Acthar's distribution and payment as

Mallinckrodt's exclusive agent.  UBC's utilized Express Script's pharmacy arrangement services

(Accredo), specialty drug distribution (CuraScript) and direct billing and payment (Express

Scripts) functions to allow Mallinckrodt to maintain and enhance its monopoly power in the

ACTH market.

338.    Mallinckrodt has willfully maintained its monopoly power in the ACTH drug

market through its exclusive arrangement with Express Scripts from 2007 through 2017.  Having

Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially,

and nearly double in the ensuing years.

**Anticompetitive Act 2: The Synacthen Acquisition**

339.    By 2013, Mallinckrodt had identified a competitive threat to its monopoly power,

71

despite its exclusive arrangements with Express Scripts.  When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly.  Recognizing that the entry of Synacthen to the ACTH market would threaten its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009, it was unable to do so.

340.    When Novartis agreed to sell Synacthen to Retrophin in 2013, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by Retrophin.  Retrophin had agreed to buy Synacthen for $16 million, Mallinckrodt paid $135 million.  It licensed the U.S. rights to Synacthen from Novartis, but did not bring this viable synthetic alternative to market.  Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

341.    This conduct contributed to Mallinckrodt's maintenance of monopoly power. Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen acquisition had the purpose and effect of suppressing rather than promoting competition in the ACTH market.  Mallinckrodt was able to raise prices at will.

342.    But Mallinckrodt could not get away with keeping Synacthen off the market without the substantial assistance and agreement of Express Scripts, who traded exclusivity and a share of monopoly profits for withholding its demonstrated power and leverage to reduce drug prices.

343.    Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein.  Today the prices stand at over $43,000.

344.    The challenged conduct caused Acument to pay artificially inflated prices for Acthar in the ACTH drug market.

345.    There is no procompetitive justification for the conduct of Mallinckrodt, Express

Scripts or Dr. Tumlin.  Rather these Defendants combined to lock Acthar into a restricted

distribution model, overseen by the ASAP program, to ensure enhanced monopoly profits for all

of them.  The Synacthen acquisition only prevented competition, and preserved the enhanced

monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion.

**Plaintiff is an Indirect Purchaser of Acthar Harmed by**
**Defendants' Anti-Competitive Conduct**

346.    Acument has been indirectly injured in its business and property by reason of

Mallinckrodt's unlawful monopolization in concert with Express Scripts and Dr. Tumlin.

Acument's injuries consist of paying higher prices to purchase Acthar than it would have paid

absent the conduct of Mallinckrodt and its exclusive agent, Express Scripts.  Acument's injuries

are the type of harm the Tennessee laws were designed to prevent and flow from which makes

Mallinckrodt's, Express Scripts' and Dr. Tumlin's conduct unlawful.

347.    The product ships from Mallinckrodt's agent directly to the patient.  Payments

flow directly from Rockford to Express Scripts, via CVS Caremark, for the benefit of

Mallinckrodt.  Express Scripts deducts its agreed-upon share of Acument's payments before

forwarding them to Mallinckrodt.

348.    As described herein, Defendants' acts and practices constitute monopoly

maintenance in violation of the Tennessee antitrust laws.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and against

Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys'

fees, and such other relief deemed just and appropriate by this Court.

## COUNT II
## ACUMENT v. ALL DEFENDANTS
## ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
## RESTRAINT OF TRADE IN VIOLATION OF THE TTPA

349.    Acument hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

350.    As set forth above, Mallinckrodt has entered into exclusive agreements with the agent for its largest customers, Express Scripts.  These agreements preserved and extended Mallinckrodt's monopoly power, and allowed both Mallinckrodt and Express Scripts to raise and fix the prices for Acthar to Express Scripts' direct clients, including Rockford, and indirect clients, like Acument.

351.    These agreements violated the TTPA, § 47-25-101 et seq., as set forth herein.

### The Role of Express Scripts in the Specialty Drug Market

352.    The maintenance of Mallinckrodt's monopoly over the ACTH market would not be possible without its agreement in restraint of trade with Express Scripts.

353.    As described above, Express Scripts is one of the largest PBMs and thus one of the largest buying agents of pharmaceuticals in the country.

354.    It has substantial buying power, and therefore market power, as a result of its position as one of the largest purchasers of pharmaceuticals in the country, and one of largest representatives of health plans that purchase pharmaceuticals for their beneficiaries.

355.    The Express Scripts Entities have developed a consolidated network of specialty pharmaceutical management, distribution and reimbursement that creates a direct pipeline between the manufacturer and the patient.  The Express Scripts Entities operate a specialty pharmaceutical distributor, a specialty pharmacy, and a reimbursement HUB, all of which operate in service of the specialty drug manufacturer [here, Mallinckrodt] concomitantly with

Express Scripts' service as a PBM for health plans and patients.

356.    Because Express Scripts represents more than 80% of pharmaceutical buyers in the United States, it has the unique position to use its market power to push back against high pharmaceutical prices, especially specialty drugs like Acthar.  Express Scripts has demonstrated its ability to wield its market power to effectuate lower costs for high priced specialty drugs.

357.    The above-described example of Turing's Daraprim is stark in that Express Scripts used its market power to produce a comparable drug for $1.  Instead of the $750.00 per pill charged by Turing, Express Scripts charges its clients $1.  Instead of one year's course of treatment costing $361,000, it costs less than $100 to Express Scripts customers.

### Express Scripts' Agreement with Mallinckrodt to Raise and Fix Prices for Acthar

358.    In 2007, when Express Scripts entered its exclusive arrangement with Mallinckrodt's predecessor Questor, it did not push back against Questcor's decision to raise prices.  Instead, when confronted with the price increase, Dr. Miller asserted that "[t]he increase was a manufacturing decision.  I can't comment on it."  Id.

359.    There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payor prices set by Questcor to its clients, but it so agreed.

360.    By 2015, Acument contracted with CVS Caremark for the provision of specialty drugs, like Acthar, to its employee beneficiaries.  CVS Caremark simply charged the same inflated AWP-based prices based on the prices set by Mallinckrodt in agreement with Express Scripts, as the product continued to flow directly from Express Scripts to the patients of other PBMs, like CVS Caremark.  As a result, the Mallinckrodt-Express Scripts' agreement to fix prices preserved and enhanced Mallinckrodt's monopoly power and injured payors like Acument being charged the same artificially inflated prices for Acthar.

361.    As a result, Express Scripts conspired and agreed with Mallinckrodt to fix and charge artificially inflated prices for Acthar to CVS Caremark clients, like Acument.

362.    At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) effectively excluding less expensive, potentially superior competitive products from the ACTH drug market; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the ACTH drug market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of its Mallinckrodt's enhanced monopoly power.

363.    There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts.

364.    Acument has been injured in its business and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar.  Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the ACTH drug market.

365.    Acument's injuries consist of paying higher prices to purchase Acthar than they would have paid absent the unlawful conduct of Mallinckrodt and Express Scripts.  Acument's injuries are the type the Tennessee antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

366.    Defendants' acts and practices constitute anti-competitive agreements in unreasonable restraint of trade in violation of the Tennessee antitrust laws.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys'

fees, and such other relief deemed just and appropriate by this Court.

## COUNT III
## ACUMENT v. ALL DEFENDANTS
## VIOLATIONS OF THE TENNESSEE CONSUMER FRAUD LAWS

367.    Acument hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

368.    The Tennessee Consumer Protection Act of 1997 ("TCPA") creates a private right of action for consumers to sue for violations thereof.   Tenn. Code Ann. § 47-18-101, et. seq.

369.    The TCPA was enacted "to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . ., to encourage and promote the development of fair consumer practices; [and] . . . to declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state . . ." Tenn. Code Ann. § 47-18-102.

370.    A consumer is defined as "any natural person who seeks or acquires by purchase, … or other disposition, any goods…".  Tenn. Code Ann. § 47-18-103(2).  "Person" includes corporations, like Acument.  Tenn. Code Ann. § 47-18-103(13).  Therefore, Acument is both a consumer and "legitimate business enterprise" for purposes of the TCPA.

371.    The consumer transaction at issue here – the sale of Acthar – took place in the conduct of trade or commerce within Tennessee.

372.    The TCPA "is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." *Morris v. Mack's Used Cars,* 824 S.W.2d 538, 540 (Tenn. 1992); Tenn. Code Ann. § 47-18-102(2).

373.    A plaintiff-consumer suing under the TCPA must prove two things: (1) that the defendants engaged in unfair or deceptive acts or practices declared unlawful by the TCPA, and (2) that the defendants' conduct caused an ascertainable loss of money or property.  Tenn. Code Ann. § 47-18-109(a)(1).

374.    Tenn. Code Ann. § 47-18-104(a) makes unlawful any "unfair or deceptive acts or practices affecting the conduct of any trade or commerce".

375.    Tenn. Code Ann. § 47-18-104(b) defines "unfair or deceptive acts or practices" include the following, among others:

> (2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services.

> (3) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by another.

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have.

> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

> (8) Disparaging the goods, services or business of another by false or misleading representations of fact.

> (11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

376.    Defendants engaged in the following unfair and deceptive acts or practices, which violate the aforesaid provisions of the TCPA:

> a.    By entering into the exclusive distribution arrangement described herein in 2007, and not disclosing the same to Acument, especially in the ASAP form given to Acument's beneficiary and Dr. Tumlin, Defendants engaged in unfair or deceptive acts, made misrepresentations and omissions of material fact, to Plaintiff that impeded Plaintiff's efforts to contain its

costs for specialty drugs like Acthar, and then sending bills for Acthar which charged the artificially inflated prices which Defendants agreed amongst themselves to charge Plaintiff.  This caused at least a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval and/or certification of Acthar sold by Mallinckrodt, the affiliation, connection or association between the various Defendants and the roles in the Acthar scheme alleged, misrepresented the same, and/or constituted unfair or deceptive conduct which created a likelihood of confusion or a misunderstanding by Plaintiff.

b.    Defendants conspired and agreed to adopt the above-described ASAP program and the ASAP form (Exhibit "A" hereto) in 2007, and to maintain the Program and form through 2015-16 (when Plaintiff paid for Acthar), in order to mislead and deceive Acument and its beneficiary about Express Scripts' direct role as the "hub" of patient care as it concerns the medical conditions for which Acthar is indicated, and to bypass Plaintiff's efforts to contain and reduce costs for specialty drugs.

c.    Starting in July 2007, Mallinckrodt issued a misleading and deceptive announcement about its new distribution strategy, but the announcement failed to disclose that more than pharmacy distribution was being handed over to Express Scripts; all aspects of distribution, pricing and product sales were now being handled by Express Scripts, and its wholly-owned subsidiaries, as part of a "hub" of services for which Mallinckrodt contracted.

d.    Express Scripts made material misrepresentations and engaged in deception about its contractual relationships with Mallinckrodt and the real reasons for the exorbitant Acthar price increases between August 2007 and 2016.  In 2007, when asked directly about the huge price increase, Dr. Miller of Express Scripts' misled and deceived the public by claiming "[t]he increase was a manufacturing decision.  I can't comment on it."  In truth, it was a joint decision by Defendants, reflected in contracts, agreements and understandings between them.

e.    Express Script's Dr. Miller and Express Scripts remained silent about the truth about Acthar's "value" for years, so that Express Scripts could continue to charge false, misleading and excessive prices for Acthar to payors like Plaintiff.  In fact, it was not until the spring of 2017 – after Plaintiff made its first payment for Acthar—that Express Scripts admitted Acthar was not worth the price Express Scripts and Mallinckrodt were charging for it.  That year, ESI's Senior Vice President of Supply Chain and Specialty Pharma, Everett Neville, stated, "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [ESI's Chief Medical Officer, Dr,] Steve[Miller] could

comment."  Mr. Neville went on to say, "I think [Dr. Miller] and I both would agree, and I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value.".  Mr. Neville stated that he "personally told [Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."  In the same public setting, Dr. Miller stated, "[i]f you look at the data, the indications for the drug are . . . in the compendium, it's listed under a lot of indications, its real use should be very, very limited.  It's an old drug.  There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management." These revelations came far too late to save Plaintiff from being overcharged for Acthar, and demonstrate that Defendants conspired and agreed to commit acts or practices in violation all of the above-described sub-sections of 73 Pa. Stat. Ann. §§201.  For instance, Express Scripts misled Plaintiff and deceived Plaintiff about its approval of Acthar and the benefits of Acthar as a valuable specialty drug "worth" what it and Mallinckrodt were charging, in relation to other drugs and treatments (in violation of above listed subsections (5) and (7) of the TCPA).

f.    Defendants misled and deceived Acument and the public about their direct relationship, their joint decision to raise the prices of Acthar, and the lack of value of Acthar for the prices being charged, in order to intentionally and deceptively charge false, misleading and excessive prices for Acthar, during the period between 2007 (when they entered into their exclusive distribution arrangement), through 2013 (when Mallinckrodt acquired Synacthen in 2013 and Express Scripts did nothing about it), and up to at least 2017 when Express Scripts began to tell the truth.  Express Scripts then offered discounts off the inflated prices of Acthar which were far less than the discounts offered for either brands or generics, while failing to disclose the truth about the pricing disparity for Acthar (even with the discounts), thereby misleading Plaintiff as to the reasons for, existence of, or amounts of the Acthar price reductions, including the provision of free Acthar as part  of an undisclosed "buy 1, get 1" program for doctors, in violation of sub-section (11).

g.    In their promotion of Acthar to treat diseases other than IS, like the DM/PM suffered by Acument's beneficiary, Defendants have disparaged the goods, services or business of other sellers of drugs that treat such diseases more effectively and safely, and for much less money, by false or misleading representations of fact.

h.    Defendants acts or practices, including the failures to act and to speak the truth in the face of false, misleading and deceptive statements about Acthar's pricing, distribution and value, constitute unfair and deceptive acts or practices.

377.    The acts and practices described herein demonstrate that Mallinckrodt, Express Scripts and Dr. Tumlin acted unlawfully within the meaning of the TCPA such that Acument may be awarded up to three times its actual damages sustained, and such additional relief as deemed necessary or proper.  These damages consist of, inter alia, the difference between the true price of Acthar before Mallinckrodt engaged with Dr. Tumlin in at least 2011 and with Express Scripts beginning in 2007 to artificially inflate the "average wholesale price" of Acthar, as required by contract to be charged, and the inflated prices of Acthar charged to Plaintiff in 2015-2016.

378.    Acument seeks relief against Mallinckrodt, Express Scripts and Dr. Tumlin for their unfair and deceptive conduct which allowed Defendants to raise and fix the prices of Acthar at supra-competitive levels, and to maintain Mallinckrodt's monopoly power in the market for ACTH drugs allowing unfettered price increases.

379.    Mallinckrodt and Express Scripts agreed to raise the prices of Acthar, and Dr. Tumlin agreed to charge Acument and its beneficiary these prices.

380.    Acument was injured as a direct and proximate result of the Defendants' conduct in violation of the TCPA sections above, and hereby seeks damages.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and against Defendants in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT IV
### ACUMENT v. ALL DEFENDANTS
### <u>UNJUST ENRICHMENT</u>

381.    Acument hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

382.     This Count alleges unjust enrichment against all Defendants.

383.     Acument's covered beneficiary received direct shipments of Acthar from Mallinckrodt via CVS Caremark.  In exchange for Acthar, Acument made direct payments to CVS Caremark for the benefit of Mallinckrodt, via Dr. Tumlin and Express Scripts.  Indeed, such payments were transferred by CVS Caremark to Mallinckrodt through its exclusive agent, Express Scripts pursuant to a prescription written by Dr. Tumlin that charged the inflated Acthar AWP.  Like Express Script, CVS Caremark reduced its payment to Mallinckrodt via Express Script by a certain amount previously agreed to by Mallinckrodt, Express Scripts and CVS Caremark.  The amount charged by Mallinckrodt for the Acthar was the amount paid by Acument, less the applicable co-pay paid by the Patient.

384.     The amounts paid by Acument were valuable to Mallinckrodt, Express Scripts and Dr. Tumlin, and all Defendants were unjustly enriched by such payments, in that, the prices charged by Defendants at extremely high prices were valuable and beneficial to all Defendants.

385.     By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from Acument, namely grossly inflated payments, revenues and profits from their coordination all aspects of Acument's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for the Defendants to retain such benefits.

386.     By engaging in the unlawful conduct described herein, Defendants have been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market.

387.     Defendants were able to extract exorbitant revenue from Acument beyond what they could have received in the absence of such unlawful conduct.  This conduct violated

Tennessee law and, as such, interfered with the legally protected interests of Acument.

388.    Acument is therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and against Defendants in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT V**
**ACUMENT v. ALL DEFENDANTS**
**FRAUD**

389.    Acument hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

390.    Defendants' acts violate the common law against negligent misrepresentation and fraud.

391.    In setting the inflated, AWP-based prices for Acthar, which prices Acthar paid, the Defendants made material misrepresentations that those prices represented the purported "average" of "wholesale prices" for Acthar, or some price reasonably related thereto, which they did not.  Defendants also misrepresented that the inflated AWP prices for Acthar represented the actual value of the product in the marketplace, which they did not.

392.    These representations were material to the transactions at hand in that Acument used and relied upon these AWP prices, as set forth in its PBM contracts, as the amount to pay and/or reimburse for Acthar.

393.    As set forth more fully above, these prices were artificial prices, unrelated to any actual, reasonable price in the marketplace, or the actual value of Acthar, but created and

manipulated by the Defendants for the purpose of generating exorbitant revenue, thus constituting false representations which the Defendants knew or, in the absence of recklessness, should have known to be false.

394.    The Defendants made these false representations about the prices of Acthar with the intent of misleading Acument into relying on the prices as real and fact-based prices, rather than artificially inflated prices.

395.    Acument justifiably relied upon these false misrepresentations in purchasing and/or reimbursing Acthar at the amount charged by Medco/Express Scripts and CVS Caremark based on the prices set by Mallinckrodt and Express Script by contract, as charged by Dr. Tumlin.  These prices were included in Acument's PBM contract, and thus Acument was obligated to pay them.

396.    The prices for Acthar set forth in such Acument's contracts with Medco/Express Scripts and CVS Caremark were prices set by Mallinckrodt and Express Scripts as provided by the contracts between them.  As such, all Defendants communicated these false AWP prices for Acthar directly to Acument for the Acthar sold to Acument's Patient by Dr. Tumlin's prescription.

397.    Defendants knew or should have known that Acument was required to pay the inflated AWPs for Acthar by its PBM agreements, and thus intended that Acument reasonably rely on such prices as the "average wholesale prices" for Acthar.

398.    As a direct and proximate result of the false representations of the Defendants, as set forth above, Acument was harmed in that they were unaware of the artificial, inflated prices of Acthar, would not have paid and/or reimbursed the artificially inflated prices for Acthar had they known of the false representations and, in fact, overpaid for the Acthar because of the false

representations.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and against

Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys'

fees, and such other relief deemed just and appropriate by this Court.

**COUNT VI**
**ACUMENT v. ALL DEFENDANTS**
**CONSPIRACY TO DEFRAUD/CONCERTED ACTION**

399.     Acument hereby incorporates by reference the averments of the foregoing

paragraphs as if fully set forth herein and further allege as follows.

400.     As set forth more fully above, beginning at least as early as 2007, the exact date

being unknown to Acument, and continuing thereafter until the present, Defendants and other

unnamed co-conspirators, between and among themselves and others, entered into an agreement

and/or otherwise engaged in a continuing conspiracy to defraud and deceive Acument by causing

them to pay more for Acthar than they otherwise would have paid in the absence of the

Defendants' conspiracy and concerted action.

401.     Pursuant to the unfair and deceptive scheme to distribute, market and sell Acthar

to derive substantial profits, and the conspiracy alleged herein, and in furtherance thereof,

Defendants and their co-conspirators engaged in a wide range of activities, the purpose and

effect of which was to deceive Acument, and acted or took substantial steps in furtherance of the

conspiracy.  Those acts include the following:

       a.   discussing and agreeing among themselves and with their co-conspirators that
they would directly control the prices at which Acument paid for Acthar;

       b.   discussing and agreeing among themselves and with their co-conspirators that
they would increase the prices at which Acument paid for Acthar;

       c.   discussing and agreeing among themselves and with their co-conspirators that
they would directly control the ASAP program materials and website which

85

enrolled patients into an exclusive distribution network for the administration of Acthar, allowing Defendants to conduct their unfair pricing scheme for Acthar;

    d.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the exclusive distribution network for Acthar through the ASAP Program;

    e.   discussing and agreeing among themselves and with their co-conspirators that they would rely on employees to promote the ASAP Program through the marketing alleged herein;

    f.   discussing and agreeing among themselves and with their co-conspirators that they would participate in the affairs of the ASAP program by using a fraudulent scheme to market and sell Acthar at inflated prices; and

    g.   discussing and agreeing among themselves and with their co-conspirators that they would conceal and suppress the truth about the Acthar inflated prices, the monies earned from payors, like Acument, and their exclusive arrangement to maintain and enhance Mallinckrodt's monopoly power as alleged herein.

402.    In addition to the specific facts set forth above, it is alleged the Defendants and their co-conspirators engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling the direct distribution, marketing, sale, prescription and administration of Acthar to Acument and its covered Patient, and deriving substantial profits from these activities.

403.    The Defendants performed the conspiratorial acts set forth herein intending to injure payors of Acthar, like Acument, by causing them to pay inflated prices so that the Defendants could derive substantial profits.

404.    The Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent and/or with knowledge of the injury and damage it would cause to the Acument, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

405.    As a direct and proximate result of the Defendants' conspiracy as alleged herein,

Acument have been injured and damaged, and the Defendants are jointly and severally liable for such injuries and damages.

      **WHEREFORE,** Acument demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**PRAYER FOR RELIEF**

      WHEREFORE, Acument requests the Court to enter the following relief:

      a.      Declare unlawful the acts and practices alleged herein, enjoin the Defendants from committing the acts alleged herein, and restore the status quo before the unlawful conduct took place;

      b.      Enter judgment against all Defendants for the violations alleged herein;

      c.      Award the actual damages incurred by Acument as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

      d.      Award statutory damages set forth herein under the statutory claims alleged;

      e.      Award multiple damages by operation of law;

      f.      Award punitive damages;

      g.      Award Acument the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees; and

      e.      Award such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Acument demands a trial by jury of all issues so triable in this cause.

Respectfully submitted,

By: _____

Patrick M. Ardis, Esq.
(TN BPR No. 008263)
R.H. "Chip" Chockley, Esq.
(TN BPR No. 020680)
Daniel V. Parish, Esq.
(TN BPR No. 027452)
WOLFF ARDIS, P.C.
5810 Shelby Oaks Drive
Memphis, TN 38134
Ph: 901-763-3336
Fax: 901-763-3376
pardis@wolffardis.com
cchockley@wolffardis.com
dparish@wolfardis.com

Donald E. Haviland, Jr., Esq.
(*pro hac vice pending*)
William H. Platt II, Esq.
(*pro hac vice pending*)
HAVILAND HUGHES
201 S. Maple Way, Suite 110
Ambler, PA 19002
Ph: 215-609-4661
Fax: 215-392-4400
haviland@havilandhughes.com
platt@havilandhughes.com

*Attorneys for Acument Global
Technologies, Inc.*